INTERPORT INCORPORATED,
Appellant,

v.

John W. MAGAW, Director, Bureau of Alcohol, Tobacco, and Firearms, and George Weise, Commissioner, U.S. Customs Service, Appellees.

No. 96–5150.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 7, 1997.

Decided Feb. 24, 1998.

Richard E. Gardiner, Fairfax, VA, argued the cause and filed the briefs for appellant.

Rudolph Contreras, Assistant U.S. Attorney, Washington, DC, argued the cause for appellees, with whom Mary Lou Leary, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney, were on the brief.

Before: WALD, GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Interport, Inc. challenges a rule of the Bureau of Alcohol, Tobacco, and Firearms prohibiting the importation of machine guns without a government purchase order. Interport also challenges as unlawful, and alternatively as a denial of due process, the seizure of its firearms by the Customs Service. The district court upheld the BATF rule as a valid interpretive rule but failed to address the validity of the seizure. We affirm the district court's holding with regard to the rule but hold that the Customs Service acted unlawfully by seizing Interport's guns without adhering to the procedure provided by statute.

## I. Background

The importation of a firearm into the United States is generally illegal unless the firearm is intended for government use (generally for law enforcement), is a sales sample, or meets other requirements not relevant here. *See* 26 U.S.C. § 5844; 27 C.F.R. § 179.111. A would-be importer must file an application, including BATF "Form 6," which requires "a detailed explanation of why the importation of the firearm falls within" one of the permitted categories. 27 C.F.R. § 179.111. The BATF has a long-standing practice that an application based upon government use of the firearm will not be approved unless the applicant submits a government purchase order along with Form 6.

An importer may bring a firearm (or any other good) into the territory of the United States without being deemed to have "imported" it if the importer stores the firearm in a Foreign Trade Zone (FTZ). *See* 19 U.S.C. §§ 81b–81c. Customs requires that any firearm in an FTZ be kept in a high-security area.

The Customs Service itself may take and store "unentered merchandise" at the request of the carrier or consignee. *See id.* § 1490(b); 19 C.F.R. § 127.1(c). Any such merchandise that remains in storage "for 6 months from the date of importation thereof, without all estimated taxes, duties, fees, interest, storage, or other charges thereon having been paid, [is] considered unclaimed and abandoned." 19 U.S.C. § 1491(a). The Customs Service may sell or destroy unclaimed or abandoned merchandise.

Customs may also take possession of any goods that do not have a proper import license; the agency must then call upon the U.S. Attorney "for the institution of the proper proceedings for the condemnation of such property." 19 U.S.C. § 1610; *see also* 19 U.S.C. § 1595a. If after those proceedings the Government is awarded title to the unlicensed goods, then it may dispose of the goods; firearms may be destroyed or given to a government unit. *See* 26 U.S.C. § 5872(b).

In June 1994 Interport stored several hundred machine guns in the high-security storage area of FTZ No. 3 in San Francisco. That same month the Customs Service told the operator of FTZ No. 3 that its high-security area did not meet standards. Rather than upgrade the facility, the operator decided to close the high-security area.

In late September, after trying without success to find another FTZ in which to store the machine guns, Interport applied for a permit to import them. In January 1995 the BATF denied Interport's application on the ground that "stockpiling" of imported weapons was not permitted except in a Customs bonded warehouse or an FTZ. Interport reapplied and the BATF in May again denied the application, this time explaining that the BATF "requires that a purchase order from the purchaser be submitted with the Form 6 application."

Meanwhile, Customs twice by letter notified Interport that any guns remaining in the

FTZ after October 14, 1994 would be taken into the custody of the Government, and that after six months they would be transferred to Fort Benning, Georgia and destroyed. The first letter did not cite any authority for the proposed action; the second referred only to 19 U.S.C. § 1490 and 19 C.F.R. § 127.1, which describe the authority of the Customs Service to keep merchandise in storage at the request of the carrier or the consignee.

In October 1994 Customs moved the guns to its own storage facility in San Francisco. In June 1995, after again notifying Interport of its intent to do so, Customs sent the guns to Fort Benning and informed Interport that it considered the guns to have been abandoned by operation of law—presumably, § 1491(a)—as of April 1995. Interport objected and Customs in a second letter confirmed its plan to proceed with immediate destruction of the guns. Interport then sued, arguing that (1) the purchase-order requirement of the BATF is (a) an invalid legislative rule because it was not promulgated pursuant to notice-and-comment procedures or, (b) if an interpretive rule, invalid because it is (i) unreasonable and (ii) violates the Tenth Amendment to the Constitution of the United States; and (2) the procedures by which the Customs Service took possession of its guns (a) were without statutory authority and (b) denied Interport due process of law in violation of the Fifth Amendment to the Constitution of the United States.

On cross motions for summary judgment the district court ruled in favor of the Government. *See Interport, Inc. v. Magaw,* 923 F.Supp. 242 (D.D.C.1996). The court held that the purchase order requirement is an interpretive rule, valid because it is a "reasonable way to implement the statute." *Id.* at 245. The court also held that the Government's order to destroy the guns was "too severe a remedy" because the "plaintiff had been put in a difficult position by virtue of the fact that Customs' determination that FTZ # 3 did not meet standards for secure storage came after plaintiff already had shipped its weapons to FTZ # 3." Consequently, the court ordered the Government not to destroy the machine guns and helped the parties reach an agreement about storing

them "pending appropriate disposition." Interport appealed.

## II. Analysis

■ We hold that the purchase-order requirement is an interpretive rule and that as such the rule is reasonable and therefore entitled to our deference. We also hold that the Customs Service acted unlawfully when it took possession of the machine guns under the purported authority of an inapplicable statute. We reject without need of further comment Interport's argument that the purchase-order rule violates the tenth amendment in that it interferes with the ability of the States to purchase imported machine guns; the tenth amendment protects the States from the federal Government acting in derogation of their rights as States, not from interference with their rights as consumers like any others. *See Hodel v. Virginia Surface Min. & Reclam. Ass'n,* 452 U.S. 264, 287–88, 101 S.Ct. 2352, 2365–66 (1981).

### A. Is the purchase-order requirement an interpretive rule?

■ The Government argues that the requirement of a government purchase order for the importation of a firearm for government use is an interpretive rule and hence exempt from the notice-and-comment requirements applicable to legislative rules under the Administrative Procedure Act. *See* 5 U.S.C. § 553(b)(A), (d)(2). The distinction between an interpretive rule and a legislative rule is fuzzy at best. *See American Hospital Assoc. v. Bowen,* 834 F.2d 1037, 1045–46 (D.C.Cir.1987). In one familiar formulation, the distinction is that an interpretive rule "simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties," whereas a legislative rule "intends to create new law, rights or duties." *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc). As a moment's reflection will show, this formulation of the distinction is much more easily stated than applied. *See* Robert A. Anthony, *"Interpretive" Rules, "Legislative" Rules and "Spurious" Rules: Lifting the Smog,* 8 ADMIN. L.J.

A<small>M</small>. U. 1, n.10 & nn.13–14 (1994) (citing cases bemoaning difficulty of applying distinction).

In this case, however, it is fairly clear that the purchase order requirement is an interpretive rule under the standards of *General Motors*. The statute provides in relevant part that an importer must

> establish[ ] . . . under regulations as may be prescribed by the Secretary [of the Treasury] . . . that the firearm to be imported or brought in is (1) being imported . . . for the use of [a government].

26 U.S.C. § 5844. The implementing regulation, which was promulgated by the BATF after notice and comment, provides in turn that the importer has the burden of "establish[ing] to the satisfaction of the Director" that the firearm will be used in accordance with the statute. 27 C.F.R. § 179.111(a). Finally, the challenged rule—stating that a government purchase order is the only way to "satisf[y] the Director" on that score— interprets the government-use restriction as a requirement that the importer have a present government purchaser rather than merely an intent to sell only to a government user.

The purchase-order rule neither imposes a new requirement upon nor determines the rights and obligations of the importer; rather, it explains more specifically what is meant in the general rule which, as we said, was the subject of notice-and-comment rulemaking. The purchase order requirement is therefore an interpretive rule and not invalid for want of notice-and-comment pursuant to the APA.

**B. Is the purchase-order rule reasonable?**

 We defer to an agency's reasonable interpretation of the laws and regulations it administers none the less because that interpretation appears in an interpretive rather than a legislative rule. *See, e.g., Wagner Seed Co. v. Bush*, 946 F.2d 918, 922 (D.C.Cir. 1991).[1] Because the purchase-order requirement is an eminently reasonable interpreta-

tion of the regulation interpreting 26 U.S.C. § 5844, we uphold the rule.

The statutory scheme is clearly designed narrowly to restrict the importation of machine guns to authorized users, including governments. The purchase-order requirement makes clear to the importer that it must be importing for the use of a specific government buyer, not merely in the expectation of later being able to find a government buyer. This requirement is certainly consistent with the statute. Indeed, why would the Congress have separately allowed for the importation of sales samples if it had believed that the statutory scheme would permit an importer to import guns without a buyer already lined up and thus to use one or more of the guns as samples in its sale effort? *See* 26 U.S.C. § 5844(3). In addition, the rule is designed to minimize the burden placed upon both importers and buyers; in particular, we are told that a "purchase order" is defined broadly enough to cover any written expression of present intent on the part of a government to purchase a firearm including, for example, a letter.

Nonetheless, Interport argues that by preventing it from importing guns into the United States until it has found a government purchaser, the requirement of a purchase order increases both the delay and the cost facing a government agency that wants to buy machine guns, without providing any offsetting increase in safety. Because the gun may lawfully be brought into an FTZ within the territory of the United States, Interport argues, it would be no more of a danger to the public if Interport could store the gun in its own high-security storage facility. Even if Interport is correct on that score, however, it matters not for the resolution of the present issue. The measure of an interpretive rule is its fidelity to the congressional intent expressed in the statute it interprets, not whether the underlying statutory scheme is economically efficient.

**1.** *But cf. Health Insurance Ass'n of America v. Shalala*, 23 F.3d 412, 424 n. 8 (D.C.Cir.1994), which in a dictum suggests an inconsistency between *Wagner Seed* and *National Latino Media Coalition v. FCC*, 816 F.2d 785, 788 (D.C.Cir.

1987). *NLMC* itself repeats in a dictum the statement of a pre-*Chevron* case that courts "are always free to choose" not to defer to an interpretive rule.

### C. Did Customs act pursuant to lawful authority in seizing the machine guns?

█ Interport argues that Customs acted unlawfully when it seized Interport's machine guns. We agree. The statute upon which Customs relied, 19 U.S.C. § 1490, does not in fact provide it with the authority claimed. That section permits Customs to take possession of merchandise only at the request of the carrier or the consignee thereof. *See* § 1490(b). Customs acknowledges that no such request was made in this case. The statute also provides a process under which merchandise that cannot enter the United States is to be transferred to a bonded warehouse, after notification of the warehouse by the carrier. *See* § 1490(a). But here there is no evidence that the facility at which the machine guns were stored, if it was a bonded warehouse, received notification of any kind. Customs argues nonetheless that either § 1490(a) or § 1490(b) somehow permitted it to take custody of the guns because "the machineguns could not remain where they were without endangering the public" and the prior version of the statute had authorized Customs to "take custody" of items without prior notification by the carrier. Under § 1490 as amended, however, Customs clearly does not have the authority to take custody of the guns.[2] It follows that Customs did not succeed to ownership of the goods under § 1491.

Another provision of title 19, section 1595a, does provide Customs with the authority to seize merchandise "attempted to be introduced into the United States" without a required import license. As Interport points out, however, a seizure under § 1595a must be accomplished pursuant to the procedures set forth in §§ 1600–1619, including notice to the U.S. Attorney to initiate condemnation proceedings. In taking possession of Interport's machine guns, Customs neither invoked this provision nor complied with its requirements. Indeed, Customs continues to assert that § 1595a does not even apply to the current situation because Interport did not attempt to introduce the guns without the required permit; rather, it was Customs that initiated the controversy by removing them from the FTZ and thereby subjecting them to the import laws.

We do not decide now whether the Customs Service would have had authority to seize the machine guns under § 1595a (or indeed whether some other statute would have permitted Customs to take custody of the weapons). The Service has relied solely upon § 1490 as authority for taking custody of the guns, and we hold that statute inapplicable in this case. Customs must now either move immediately to perfect its present possession of the guns by some other means or do its best to restore the *status quo ante* by returning the guns to Interport in an appropriately secure FTZ or bonded warehouse.

Because we conclude that Customs did not have statutory authority for its actions, we need not reach Interport's due process claim.

### III. Conclusion

The requirement that an importer of firearms have a government purchase order is a valid and reasonable interpretive rule. Therefore the BATF properly denied Interport permission to import its machine guns. The Customs Service overstepped its authority, however, when it purported to take possession of the machine guns pursuant to 19 U.S.C. § 1490. The Customs Service must therefore either initiate at once lawful proceedings to perfect its custody of the machine guns or return them forthwith to custody of Interport.

*So ordered.*

---

**2.** Under the former version of § 1490 if merchandise could not enter the United States a Customs official could "take [it] into his custody and send it to a bonded warehouse or public store." When the Congress amended § 1490 in 1993 the requirement that Customs officials take merchandise into "custody" had become a "legal fiction" inasmuch as third parties generally effected the transfer without the intervention of the Customs Service. H.R.Rep. No. 103–361(I), at 148 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2552, 2698. In the course of eliminating the fiction, the Congress also eliminated whatever authority the Customs Service had under § 1490 to move goods on its own initiative.