177 F.3d 1030
 ALASKA PROFESSIONAL HUNTERS ASSOCIATION, INC., et al., Petitioners,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent.
 No. 98-1051.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 29, 1999.
Decided June 4, 1999.
 
 On Petition for Review of an Order of the Federal Aviation Administration.
 William P. Horn argued the cause for petitioners. With him on the briefs were Douglas S. Burdin and Eric D. Reicin.
 Edward Himmelfarb, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were Frank W. Hunger, Assistant Attorney General, and Robert S. Greenspan, Attorney.
 Before: HENDERSON, RANDOLPH, and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge RANDOLPH.
 RANDOLPH, Circuit Judge:
 
 
 1
 In January 1998 the Federal Aviation Administration published a "Notice to Operators" aimed at Alaskan hunting and fishing guides who pilot light aircraft as part of their guiding service. The Notice required these guide pilots to abide by FAA regulations applicable to commercial air operations. The question in this petition for judicial review, brought by a guide organization and individual guides, is whether § 553 of the Administrative Procedure Act required the FAA to proceed by way of notice and comment rule making rather than by announcement in the Federal Register.
 
 
 2
 Fishing and hunting are big business in the State of Alaska. A large proportion of the State's population depends on the income these activities generate. Small lodges in remote regions of the State cater to hunters and fisherman, providing food and shelter, guide services, and air transportation to and from the lodge and on side trips, all for a flat fee. It is common for a fishing or hunting guide to serve as the pilot of the light aircraft typically used in these operations. Beginning in 1963, the FAA, through its Alaskan Region, consistently advised guide pilots that they were not governed by regulations dealing with commercial pilots.
 
 
 3
 The advice stemmed from Administrator v. Marshall, 39 C.A.B. 948 (1963), a decision rejecting the FAA's attempt to sanction Ralph E. Marshall, a registered Alaskan hunting and fishing guide and the holder of an FAA-issued private pilot's license. On a hunting trip, Marshall flew his customer out of Kotzebue, Alaska, searching for polar bear. Regulations then in effect said that a "private pilot may pilot aircraft in connection with any business or employment if the flight is merely incidental thereto and does not involve the carriage of persons or property for compensation or hire." See Marshall, 39 C.A.B. at 948 n.1. The Civil Aeronautics Board, adopting the hearing examiner's opinion as its own, ruled that Marshall's flight with the hunter in search of polar bear was "merely incidental" to his guiding business, in part because he had not billed for it separately. See id. at 950-51. We will have more to say about Marshall in a moment.
 
 
 4
 The versions of parts 121 and 135 of the FAA's regulations (14 C.F.R. pts. 121 & 135) in effect in the early 1960s applied to (among others) "commercial operator[s]": those persons operating aircraft "for compensation or hire."[1] 14 C.F.R. §§ 121.1(a)(5), (d), 135.1(a)(2) (1965). In view of Marshall, the FAA's Alaskan Region concluded that these regulations did not govern guide pilots whose flights were incidental to their guiding business and were not billed separately. Therefore only part 91, which provides general instructions regarding the operation of aircraft within the United States, applied to them. See 14 C.F.R. § 91.1. Despite many amendments during the last 35 years, parts 121 and 135 continue to apply to "commercial operator[s]," still defined as those persons who, "for compensation or hire," carry persons or property by aircraft. See 14 C.F.R. §§ 1.1, 119.1(a)(1), 121.1(a), 135.1(a)(1).[2] Although the Alaskan Region never set forth its interpretation of parts 121 and 135 in a written statement, all agree that FAA personnel in Alaska consistently followed the interpretation in official advice to guides and guide services.
 
 
 5
 Whether FAA officials in Washington, D.C., were aware of the advice being given by their counterparts in Alaska is uncertain. No correspondence or other writing bearing on the question has surfaced. This may be attributable to the FAA's organizational structure from the 1960's through the late 1980's. "The agency's first Administrator favored a management system under which officials in Washington exercised direct control over programs in the field. In 1961, however, his successor began a decentralization process that transferred much authority to regional organizations. This pattern generally endured until a 1988 'straightlining' again charged managers at national headquarters with more direction of field activities." A Brief History of the Federal Aviation Administration (last modified April 30, 1999) < http: //www.faa.gov/history.htm >.
 
 
 6
 In 1990, after the agency had reorganized, an FAA attorney in the Alaskan Region corresponded with the FAA's Washington, D.C. headquarters regarding an inquiry he had received from the manager of a fishing lodge. In a twist on Marshall, this lodge manager proposed to pick up clients staying at another lodge, fly them to a fishing spot, guide them, and then return the clients to their lodge. The manager wanted to know whether he could provide this service consistent with part 91 of the regulations. The Alaskan Region believed that Marshall controlled, but an Assistant Chief Counsel in the FAA's Washington office disagreed. Although he expressed the need for more facts, the Assistant Chief Counsel thought the manager's situation distinguishable because--as he read Marshall--the guide pilot there took off from the hunting camp and returned without landing elsewhere, whereas the manager intended to take off from a lodge, land at a fishing spot, and then return. To the Assistant Chief Counsel, this meant the flight would not be "merely incidental" to the guiding service and would be "for compensation or hire." Hence, the pilot had to be certified under, and comply with, the requirements of part 135.
 
 
 7
 The record does not reveal whether the FAA issued a formal opinion in the lodge manager's case. All that appears is the internal agency correspondence we have just summarized. What occurred after the Assistant Chief Counsel's analysis reached the Alaskan Region in 1991 is uncertain. The material before us indicates that the Alaskan Region did not begin advising guide pilots to comply with part 135. We also know, from a decision included in the parties' Supplemental Joint Appendix, that in 1992 an administrative law judge rejected the FAA's attempt to sanction an Alaskan guide pilot in a situation comparable to that in Marshall. Cecil V. Humble, a guide, a pilot and the manager of the Rainy Pass fishing and hunting lodge in Alaska, sold a hunting package to two men, who were accompanied by their wives. After staying at the lodge for a few days, the wives decided to leave before the hunt ended. Humble, who did not have part 135 credentials, flew them back to Anchorage. Citing a Civil Aeronautics Board pronouncement but not the decision in Marshall, the ALJ ruled that the flight was merely "incidental" to Humble's business, "simply an adjunct to the hunting package for which they had contracted," and therefore Humble did not need to comply with part 135. Supp. Joint App. 235.[3]
 
 
 8
 In the meantime, the FAA had begun studying guiding operations in Alaska. An FAA report, issued in 1992, expressed concern about the safety of guide pilots operating pursuant to part 91 rather than part 135. In recognition of the longstanding practice in Alaska and of the agency's advice beginning in 1963 that guide pilots were covered by part 91, the report found that "[a]ny departure from the established practice could have an economical impact on a portion of the commercial guiding populace." See A STUDY OF AVIATION COMMERCIAL GUIDING ACTIVITIES WITHIN THE STATE OF ALASKA, prepared by the Technical Analysis Branch, Alaskan Flight Standards Division, at 9 (December 1992). The report therefore recommended amending part 135.1 to allow the FAA "to issue a letter of authorization" to hunting and fishing guide pilots, allowing them to transport clients under limited conditions. See id. at 8-9. The FAA did not implement the recommendation.
 
 
 9
 In January 1997, petitioner Alaska Professional Hunters Association,[4] aware that the FAA was still considering a new regime for regulating Alaskan guide pilots, submitted a petition for rule making.[5] See Petition for Rulemaking, 63 Fed.Reg. 16,913, 16,914 (1998). The Association proposed that the FAA amend part 91 to enhance the safety of guiding operations. See id. In January 1998, without having responded to the Association's petition, the FAA published its "Notice to Operators" in the Federal Register. See Compliance with Parts 119, 121 and 135 by Alaskan Hunt and Fish Guides Who Transport Persons by Air for Compensation or Hire, 63 Fed.Reg. 4 (1998).
 
 
 10
 The Notice, which is the subject of the Association's petition for judicial review, announced that Alaskan guides who transport customers by aircraft to and from sites where they provide guiding services, with transportation included in the package price of the trip, henceforth must comply with the regulations of parts 119, 121 and 135, as applicable. See 63 Fed.Reg. at 4-5. In the future the FAA would treat these guides as commercial operators or air carriers, transporting passengers for compensation or hire. See 63 Fed.Reg. at 5. The FAA acknowledged that the Alaskan Region had not enforced parts 121 or 135 against guide pilots in the past. But it attributed this to a misreading of the Marshall case. See id. A guide's use of aircraft is, the FAA stated, integral to his business, and the customer pays for the transportation regardless whether there is or is not a separate charge for it. See id. The Notice also stated that guide pilot operations would be safer if they were conducted pursuant to the stricter aviation standards of parts 119, 121 and 135. See id.
 
 
 11
 The Association, joined by two Alaskan guide pilots, contends that the Notice to Operators altered the FAA's well-established interpretation of its regulations and should have been promulgated pursuant to notice and comment rule making. The FAA raises several defenses, among which are that the Alaskan Region's interpretation of the regulations did not represent the FAA's view because it rested on a misreading of Marshall and that the Notice to Operators was merely an interpretative rule, exempt from the notice and comment requirements of APA § 553. See 5 U.S.C. § 553(b)(A).
 
 
 12
 Our analysis of these arguments draws on Paralyzed Veterans of America v. D.C. Arena, 117 F.3d 579, 586 (D.C.Cir.1997), in which we said: "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." We there explained why an agency has less leeway in its choice of the method of changing its interpretation of its regulations than in altering its construction of a statute. "Rule making," as defined in the APA, includes not only the agency's process of formulating a rule, but also the agency's process of modifying a rule. 5 U.S.C. § 551(5). See Paralyzed Veterans, 117 F.3d at 586. When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment. Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94-95 (D.C.Cir.1997), is to the same effect: a modification of an interpretive rule construing an agency's substantive regulation will, we said, "likely require a notice and comment procedure."
 
 
 13
 The FAA thinks Paralyzed Veterans is inapposite because its January 1998 Notice to Operators did not fundamentally change any "authoritative interpretation" of its regulations. See Paralyzed Veterans, 117 F.3d at 586. The FAA is confident that the Alaskan Region's advice to guide pilots for more than 30 years stemmed from a misreading of the Marshall decision and so could not have represented the view of the agency.[6] The Notice to Operators put it this way: "there appears to have been a misinterpretation of the scope and effect of a 1963 enforcement case involving a registered hunting guide, Administrator v. Marshall, 39 CAB 948 (1963) (decided on an extremely narrow set of facts that involved a registered guide's single flight from base camp to spot game from the air and return to base camp, with no landing at a point other than the point of takeoff)." See 63 Fed.Reg. at 5.
 
 
 14
 We do not share the FAA's confidence that the ruling in Marshall--piloting was "merely incidental to [the pilot's] business as a registered Alaska guide," Marshall, 39 C.A.B. at 950--applied only to a guide pilot flying his customer from a base camp and returning to the camp without landing in between. The FAA believes these were the "extremely narrow set of facts" in Marshall because the opinion stated: "On the polar bear hunt respondent [the guide] utilizes his aircraft only to the extent of getting the hunter from the base camp out over the ice in order to spot the polar bear and return hunter to the camp." See id. at 949. According to the FAA, this means the pilot did not land his plane on the ice; the guide pilot and his passenger merely spotted the bear from the air and then turned for home.
 
 
 15
 This reading of Marshall is, we suppose, possible but it is quite implausible. For one thing, the guide's client was not in Alaska for sightseeing. His objective was to hunt and kill a polar bear and the guide's objective was to help him do just that: "in the event a polar bear was not killed, there was to be no payment of money made by [the customer] to the guides." See id. Why use a plane? The opinion explained: "It is the general practice in Alaska to utilize aircraft in transporting hunters over the ice in the hunt of polar bears where formerly dog sleds were used." See id. The guide was not searching for a polar bear so that his customer could see what one looked like. He and his customer were hunting, and hunting involves killing the quarry.[7] This must be why the opinion says several times, before and after the sentence that mentions spotting a bear, that the "sole" purpose of the flight was "hunting polar bear." See id. at 949, 951. How could this be done without landing? The plane substituted for a dog sled. It would therefore be very unlikely for the hunter and guide, after spotting a bear from the air, to return to camp and then set out on foot over the ice to shoot it. Perhaps the customer could fire at the bear from the air (although Alaskan hunting regulations might have prohibited this). Even so, one would expect the hunter to want his "trophy," which he could only recover if the plane landed. If the FAA's current reading of Marshall were correct, the existence of a regulatory violation would depend on the success of the hunt, a senseless regulatory approach. Furthermore, the Marshall opinion's failure even to mention whether the plane landed outside the base camp is powerful evidence that the decision turned on no such consideration. Compare 14 C.F.R. § 119.1(e)(2) (exempting nonstop "sightseeing flights"). On the face of the Marshall opinion--all that the FAA in Washington had before it--we think it fairly implicit that a landing away from the camp was planned and contemplated. At the least, there is severe doubt that the FAA's Alaskan Region had been misinterpreting the Marshall decision and its import.
 
 
 16
 We are unpersuaded by the FAA's additional claim that the Alaskan Region's interpretation of parts 119, 121 and 135 represented simply a local enforcement omission, in conflict with the agency's policy in the rest of the country. It is true that when a local office gives an interpretation of a regulation or provides advice to a regulated party, this will not necessarily constitute an authoritative administrative position, particularly if the interpretation or advice contradicts the view of the agency as a whole. See, e.g., Paralyzed Veterans, 117 F.3d at 587; Drummond Coal Co. v. Hodel, 796 F.2d 503, 508 (D.C.Cir.1986); N.Y. State Dep't of Social Servs. v. Bowen, 835 F.2d 360, 365 (D.C.Cir.1987). But the situation here is quite different. Agency officials in the Alaskan Region uniformly advised all guides, lodge managers and guiding services in Alaska that they could meet their regulatory responsibilities by complying with the requirements of part 91 only. FAA officials gave that advice for almost thirty years. As for the agency as a whole, the FAA noted in 1992 that its "past policy" permitted guide pilots and lodge operators to operate aircraft under Part 91. And it acknowledged in 1997 that "[u]ntil recently, lodge/guide operators have been advised that Part 135 did not address their operation of aircraft." This must be why the National Transportation Safety Board, in its 1995 Study of Aviation Safety in Alaska, described "current FAA policy" as permitting guides to fly their customers "as noncommercial operations under the general operating rules of 14 CFR Part 91, which are less restrictive than those in Part 135."
 
 
 17
 Even if the FAA as a whole somehow had in mind an interpretation different from that of its Alaskan Region, guides and lodge operators in Alaska had no reason to know this. Cf. Paralyzed Veterans, 117 F.3d at 587. Those regulated by an administrative agency are entitled to "know the rules by which the game will be played." See Holmes, Holdsworth's English Law, 25 LAW QUARTERLY REV. 414 (1909). Alaskan guide pilots and lodge operators relied on the advice FAA officials imparted to them--they opened lodges and built up businesses dependent on aircraft, believing their flights were subject to part 91's requirements only. Cf. Paralyzed Veterans, 117 F.3d at 587. That advice became an authoritative departmental interpretation, an administrative common law applicable to Alaskan guide pilots. The FAA's current doubts about the wisdom of the regulatory system followed in Alaska for more than thirty years does not justify disregarding the requisite procedures for changing that system. Throughout this period, guide pilots and lodge operators had no opportunity to participate in the development of the part 135 regulations and to argue in favor of special rules for their operations. Air transportation regulations have evolved considerably since 1963 and part 135 has been the subject of numerous rule making proceedings. Had guides and lodge operators been able to comment on the resulting amendments and modifications to part 135, they could have suggested changes or exceptions that would have accommodated the unique circumstances of Alaskan air carriage.[8] As the FAA pointed out in its brief, the agency's regulations have, in several respects, treated Alaska differently from the continental United States. See, e.g., 14 C.F.R. §§ 135.261(b)(1), 121.353, 91.323. There is no reason to suppose that with the participation of Alaskan guide pilots and lodge operators, the regulations in part 135 would not have been affected. If the FAA now wishes to apply those regulations to these individuals, it must give them an opportunity to comment before doing so. The Notice to Operators was published without notice and comment and it is therefore invalid. The petition for review is granted.
 
 
 18
 So ordered.
 
 
 
 [1]
 Part 121, promulgated in December 1964, prescribed rules "governing the certification and operations of ... each commercial operator." It stated that "[f]or the purpose of determining whether a person is a commercial operator under this part, operations are considered to be for compensation or hire when they are a major enterprise for profit and not merely incidental to the person's other business." See 29 Fed.Reg. 19,186, 19,190 (1964). Part 135, also added in 1964, prescribed rules "governing ... the carrying in air commerce by any person, other than an air carrier, of persons or property for compensation or hire (commercial operations) in small aircraft." See 29 Fed.Reg. 2,988, 2,992 (1964). Both parts have been amended numerous times since then
 
 
 [2]
 After amendments to parts 121 and 135 in December 1995, and the addition of part 119, parts 121 and 135 no longer apply to commercial operators directly. See Commuter Operations and General Certification and Operations Requirements, 60 Fed.Reg. 65,832, 65,879 (1995). Parts 121 and 135 currently apply to certain operations of persons who hold, or are required to hold, an Operating Certificate under part 119. See 14 C.F.R. §§ 121.1(a), 135.1(a)(1). Part 119 preserves the application of parts 121 and 135 to "commercial operator[s]," because it applies to persons who operate civil aircraft as "commercial operator[s]" (or air carriers) in air commerce. See 14 C.F.R. § 119.1(a)(1). It consolidates the certification and operations requirements for persons who operate under parts 121 and 135 and provides a roadmap for certificate holders to lead them to the operating rules in those parts that they must comply with. See Commuter Operations, 60 Fed.Reg. at 65,879
 
 
 [3]
 The ALJ did sanction Humble for directing one of his Rainy Pass pilots to fly clients of another guide and lodge owner between Anchorage and Neal Lake (Supp. Joint App. 237)
 
 
 [4]
 The Alaska Professional Hunters Association is an organization of more than six hundred individual guides, outfitters and other persons interested in hunting or recreational activities in the State of Alaska. Many are, or rely on, guide pilots who fly customers to remote hunting and fishing sites as part of their guiding services
 
 
 [5]
 The Administration did not publish the Alaska Professional Hunters Association's petition for rule making until more than a year later, in April 1998. See Petition for Rulemaking, 63 Fed.Reg. at 16,913
 
 
 [6]
 Respondent's brief also asserts that the Alaskan Region's advice to guide operators was not pursuant to any FAA regulation. This is clearly not the case
 
 
 [7]
 International treaties now prohibit the hunting, capturing or killing of polar bears. See, e.g., Agreement on the Conservation of Polar Bears, Nov. 15, 1973, 27 U.S.T. 3918
 
 
 [8]
 For example, in 1994, the National Transportation Safety Board recommended that part 135 be amended to establish certification, experience, qualification and training requirements specific to pilot guide/aerolodge operations. In 1995, it noted that the safety of such operations could be improved by applying some, rather than all, of part 135's requirements to Alaskan guide pilots. In both instances, it suggested that the Administration propose a rule making if it chose to place guide pilot operations under part 135