### ASSOCIATION OF AMERICAN RAILROADS, Petitioner,

v.

### DEPARTMENT OF TRANSPORTATION, et al., Respondents.

**Brotherhood of Maintenance of Way Employees, Intervenor.**

No. 99–1116.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 12, 1999.

Decided Dec. 28, 1999.

Ian Heath Gershengorn argued the cause for petitioner. With him on the briefs were John Broadley, Louis P. Warchot, and Michael J. Rush.

Dale C. Andrews, Deputy Assistant General Counsel, U.S. Department of Transportation, argued the cause for respondents. With him on the brief were Nancy E. McFadden, General Counsel, and Paul M. Geier, Assistant General Counsel.

Richard S. Edelman was on the brief for intervenor.

Before: GINSBURG, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Acting without notice and comment, the Federal Railroad Administration issued a technical bulletin interpreting a safety regulation the agency had issued through formal rulemaking just two years earlier. Petitioner claims that the technical bulletin abruptly departed from the agency's previous interpretation of the regulation and that it therefore required notice and comment rulemaking. We disagree. Reviewing the random and conflicting agency letters and other documents relied on by petitioner, we find no evidence of a definitive agency interpretation that could be changed only through notice and comment. We therefore deny the petition for review.

I

Congress directed the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety...." 49 U.S.C. § 20103(a). To "carry out all railroad safety laws of the United States," Congress created the Federal Railroad Administration, also a respondent in this case. 49 U.S.C. § 103(a); *see also* 49 C.F.R. § 1.49 (delegating authority from the Secretary of Transportation to the Federal Railroad Administrator).

The Rail Safety Enforcement and Review Act of 1992 directs the Secretary to review and revise federal rules relating to railroad track safety. *See* Rail Safety Enforcement and Review Act § 8, 49 U.S.C. § 20142. Responding to that directive, the FRA conducted a study and found that from 1989 to 1993 twenty-two roadway workers were struck and killed by trains or on-track equipment. Based on these findings and the results of a similar study by a joint labor-management task force, the FRA established a federal advisory committee comprised of representatives from management, labor, and the agency to engage in a negotiated rulemaking on the subject of roadway worker safety. The advisory committee eventually produced the Roadway Worker Protection Rule, which, following notice and comment, became effective in January 1997. *See* 49 C.F.R. §§ 214.301–214.355.

The Roadway Worker Protection Rule establishes procedures to protect roadway workers from accidents involving trains or other on-track equipment. At issue in this case is the Rule's procedure for demarcating portions of track where railroad employees are working and on-track accidents generally occur. The Rule refers to these areas as "working limits."

The precise method of establishing working limits depends on whether the work is being performed on track that is "controlled" or "non-controlled." On non-controlled track, *i.e.*, track on which trains may move without authorization from a dispatcher or control operator, the only acceptable method of establishing working limits is to render the area "physically inaccessible to trains at each possible point of entry." 49 C.F.R. § 214.327(a). On controlled track, *i.e.*, track on which all train movements must be expressly authorized, the Roadway Worker Protection Rule allows the track to remain accessible but requires that the boundaries of working limits be marked by certain procedures, one of which is known as "exclusive track occupancy." *See* 49 C.F.R.

§ 214.321. Exclusive track occupancy requires railroads to mark the boundaries of working limits with a flagman, a fixed signal displaying "Stop," a station identified in the railroad's timetable, a clearly identifiable milepost, or, in language central to this case, any other "clearly identifiable physical location prescribed by the operating rules of the railroad that trains may not pass without proper authority." *See* 49 C.F.R. 214.321(c)(1)–(5). We will refer to this last option as "paragraph (c)(5)."

Railroads taking advantage of the paragraph (c)(5) option often use unattended red flags to mark the boundaries of working limits. When a train enters a segment of controlled track containing working limits, a dispatcher directs the train engineer to travel at restricted speed until the train arrives at the unattended red flag, at which point it stops and awaits instructions from the roadway worker in charge of the working limits. The Rule provides that the roadway worker in charge may not allow trains to pass the red flag and enter the working limits until certain specified steps are taken to protect the safety of roadway workers. *See* 49 C.F.R. § 214.319(c).

The dispute in this case centers on the precise amount of information about the red flag that paragraph (c)(5) requires the dispatcher to give the train engineer. Petitioner, the Association of American Railroads (AAR), argues that paragraph (c)(5) requires the dispatcher to tell approaching trains nothing more than that they will encounter a red flag somewhere within the segment of controlled track. The FRA, supported by intervenor, the Brotherhood of Maintenance of Way Employees, reads the regulation to mean that the train engineer must be told not just that a red flag exists somewhere within the segment of controlled track, but of the flag's precise location. Without such notice, the FRA maintains, worker safety would depend entirely on trains traveling at restricted speed, the pre-Rule precaution that the agency found insufficient to protect road-

way workers. *See, e.g.,* Roadway Worker Protection, 61 Fed.Reg. 10528, 10536 (proposed Mar. 14, 1996) ("[A] blanket provision that would rely upon restricted speed to protect persons working [on] the track would not be effective."). According to the AAR, however, it is not always possible to keep a dispatcher informed of the precise location of working limits, particularly since roadway workers often move down the track, or "float," as work progresses. Notification thus requires constant radio communication, but "in the western United States ... topographical and other constraints make radio communication difficult over extended portions of the track."

Two years after issuing the Roadway Worker Protection Rule, the FRA incorporated its view of paragraph (c)(5) in Workplace Safety Technical Bulletin WPS–99–01 (January 1999). Issued without notice and comment, the technical bulletin directs that when unattended red flags or other passive devices are used to demarcate working limits, trains "must be provided with advance notification of the type and exact location of these devices."

In this petition for review, the AAR does not challenge the advance notice requirement as an unreasonable interpretation of the Roadway Worker Protection Rule. Rather, claiming that the FRA had previously interpreted paragraph (c)(5) as not requiring advance notice of precise flag location and that the bulletin amounts to an "abrupt departure" from that interpretation, the AAR argues that the Administrative Procedure Act required the agency to issue the bulletin through notice and comment rulemaking. For its part, the FRA maintains that it never ruled that paragraph (c)(5) did *not* require advance notice of precise flag location, that agency officials have consistently told railroads that unattended red flags and restricted speed alone do not comply with the Roadway Worker Protection Rule, and that notice and comment were not required because the technical bulletin is consistent with that position.

II

■ Section 553 of the Administrative Procedure Act requires "[g]eneral notice of proposed rule making," 5 U.S.C. § 553(b), and that "interested persons [have] an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). "Interpretative rules" are specifically exempted from the Act's notice and comment requirements. 5 U.S.C. §§ 553(b)(A), (d)(2); *see also Interport Inc. v. Magaw,* 135 F.3d 826, 828 (D.C.Cir.1998). Interpretative rules "simply state[ ] what the administrative agency thinks the statute means, and only remind[ ] affected parties of existing duties." *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc) (internal quotation marks omitted). Interpretative rules may also construe substantive regulations. *See Syncor Internat'l Corp. v. Shalala,* 127 F.3d 90, 94 (D.C.Cir.1997).

■ The AAR contends that the technical bulletin cannot be an interpretative rule because it "effects a change in existing law or policy." In support, the AAR relies on our recent decision in *Alaska Professional Hunters Ass'n, Inc. v. FAA,* 177 F.3d 1030 (D.C.Cir.1999). There, Alaskan fishing and hunting guides challenged a Federal Aviation Administration notice that required guides to comply with FAA regulations applicable to commercial air operations. The notice abruptly reversed a previously settled practice of the FAA, which through its Alaskan Region had for decades advised guides that they need not comply with commercial pilot regulations. We agreed with the guides that the notice should have been issued through notice and comment rulemaking. "[A]ll agree[d] that FAA personnel in Alaska consistently followed the interpretation in official advice to guides and guide services" for approximately thirty years. *Id.* at 1032. Originating in a 1963 adjudication, that advice was longstanding, uniform, and unambiguous. *See id.* at 1031.

"When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation," we explained, "the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Id.* at 1034; *see also Syncor Internat'l,* 127 F.3d at 94 (stating that a modification of an interpretative rule construing an agency's substantive regulation "will likely require a notice and comment procedure").

The AAR claims that this case is like *Alaska Professional Hunters.* Just as the FAA had definitively ruled that Alaskan guides were not subject to commercial air regulations, the AAR argues, the FRA had determined that prior notice of a red flag's precise location was unnecessary. The AAR detects this definitive interpretation in the Roadway Worker Protection Rule's Preamble, in an email and two letters from agency personnel, and in the agency's own safety manual. We find nothing in these materials, individually or taken together, that comes even close to the definitive interpretation that triggered notice and comment rulemaking in *Alaska Professional Hunters.*

To begin with, two of the documents relied on by the AAR provide no support at all for its position. The Rule's Preamble states that "working limits are delineated by flags as specified in [paragraph] (c)(5)." 61 Fed.Reg. 65959, 65969. As the agency points out, this language says no more than that working limits may be marked by flags. It says nothing about whether notice of the flag's precise location is required. The email message, written by an FRA bridge engineer, Gordon Davids, suggests that paragraph (c)(5) could be satisfied by "operating through the zone in which the red flag may be encountered at restricted speed, looking out for the red flag." Not only does Davids have no policy-making authority, however, but his phrase "looking out for the red flag," like the Preamble language, says nothing about whether the engineer must be given notice of the flag's precise location.

Other evidence the AAR cites is somewhat more convincing. A letter to a railroad official from George Gavalla, then Acting (now permanent) FRA Associate Administrator for Safety, and previously a labor representative on the federal advisory committee, states the following:

The principle behind the use of flags to establish working limits on *controlled track*.... calls for all trains ... to be aware of the existence of flags or other appropriate signals delineating the working limits. They might not know the exact location of those flags because the flags might be moved as the work progresses, but they must know that somewhere within a defined track segment they will encounter the flags. That principle has been faithfully captured in the text of the regulation.

(Emphasis in original.) Another letter to the same railroad official from Gavalla's subordinate, Edward English, contains similar language: "The use of red flags to establish working limits ... is permissible because even though the flags may 'float' as the work progresses, trains ... know that somewhere within a defined track segment they will encounter the red flags." The FRA's Railroad Workplace Safety manual states:

[A] train must be informed of the existence of working limits.... It is not sufficient to just place flags and go to work. However, a railroad may permit the flags to be moved as the work progresses, so long as all trains approaching the working limits are informed of their existence.

Not surprisingly, the FRA interprets these items rather differently. The Gavalla letter, the FRA tells us, mainly concerns safety requirements for non-controlled track. Conceding that the quoted language appears in a paragraph relating to controlled track, the agency insists that Gavalla's comment was made "in passing and to illustrate a point, [and] he was not

interpreting, nor was he asked to interpret, the requirements of section [2]14.321, which address controlled track." At oral argument, the agency took a different tack, arguing that when the Gavalla and English letters said train engineers must know that "somewhere within a defined track segment" they will encounter red flags, they were referring to an extremely short "defined track segment," apparently meaning that advance notice that flags are within the segment would amount to notice of the flags' location. As for the safety manual, the FRA points out that the manual never expressly states that red flags and restricted speed alone are sufficient to comply with the Roadway Worker Protection Rule. At oral argument, agency counsel added that the manual's phrase "informed of [the flags'] existence" should be read to imply "informed of their location."

The FRA offers its own evidence to demonstrate that it has consistently advised the railroads that red flags and restricted speed alone are insufficient to comply with the Roadway Worker Protection Rule. It refers to a February 13, 1998, letter from the AAR complaining that members of the FRA staff appear unwilling to accept the use of red flags as a satisfactory means of marking working limits. The FRA also points out that several reports finding that certain railroads violated the Roadway Worker Protection Rule noted that red flags were the only form of protection the railroads had used. In addition, the FRA asserts that the General Code of Operating Rules—a set of model procedures to which railroads using paragraph (c)(5) subscribe—requires certain practices that would have the effect of providing trains with advance notice of working limits. This is significant, the agency tells us, because paragraph (c)(5) expressly incorporates "the operating rules of the railroad." 49 C.F.R. § 214.321(c)(5).

We are not at all sure what the various and sundry bits of evidence marshaled by the parties tell us about the meaning of paragraph (c)(5). To be sure, some of the evidence, particularly the Gavalla letter, seems to support the AAR's position, and we find ourselves unconvinced by the agency's efforts to explain the letter away as, among other things, the railway equivalent of judicial dictum. We are equally underwhelmed by the agency's own evidence. Although the violation reports do note that red flags were the only form of protection used in some cases, not one of the reports states that the Rule requires advance notice of the red flag's location. The AAR's February 13 letter does indicate, as the agency points out in its brief, that the "AAR expressed its awareness of, and opposition to, how [the] FRA was interpreting its rule on these issues." But at oral argument, the AAR explained that it wrote the letter precisely because it believed that agency officials were departing from their prior interpretation of the Roadway Worker Protection Rule.

Even interpreting the evidence in the light most favorable to the AAR, however, we think it is quite clear that the FRA never adopted a definitive interpretation of paragraph (c)(5) that it could change only through notice and comment rulemaking. Although the AAR has unearthed some documents that seem, albeit sometimes vaguely, to support its argument that the agency—or at least some of its employees—may have interpreted paragraph (c)(5) as not requiring notice of precise flag location, none of those documents even comes close to the express, direct, and uniform interpretation present in *Alaska Professional Hunters*. Also, unlike *Alaska Professional Hunters*, where the regional office's position was reflected in official agency adjudications holding that Alaskan guides need not comply with commercial pilot standards, *see* 177 F.3d at 1031, 1032, nothing in this record indicates that the FRA ever held that the Roadway Worker Protection Rule did not require advance notice of red flag location. Indeed, as far as we can tell, prior to the technical bulletin, the issue regarding no-

tice of flag location had been the subject of no official agency proceeding. In other words, this record reveals no "administrative common law" (this court's words in *Alaska Professional Hunters*, 177 F.3d at 1035) that paragraph (c)(5) does not require notice of precise flag location.

This case differs from *Alaska Professional Hunters* in another important respect. Believing that they were exempt from commercial pilot regulations, "Alaskan guide pilots and lodge operators relied on the advice FAA officials imparted to them—they opened lodges and built up businesses dependent on aircraft." *Id.* at 1035. Nothing in this record suggests that railroads relied on the Gavalla letter or other documents in any comparable way. The AAR does not claim that its members made large capital expenditures based on their interpretation of paragraph (c)(5) or altered their business practices in any significant manner. Instead, the AAR claims that the railroads' agreement with the outcome of the negotiated rulemaking was "critically dependent on their ability (consistent with the regulations) to use red flags [alone] to demarcate working limits." Yet the AAR points to no evidence to support this assertion; all evidence in the record is post-negotiated rulemaking. Even if true, moreover, agreement to a negotiated rulemaking based on a presumptive interpretation of ambiguous language hardly compares to the three decades of business development that had occurred in *Alaska Professional Hunters*.

To sum up, we see the record in this case quite differently than does the AAR. We read the various letters and other documents relied on by the AAR not as evidence of a firm agency policy, but rather as the agency's initial efforts to respond to the dispute over the meaning of paragraph (c)(5) that flared up shortly after the Roadway Worker Protection Rule was issued. As one would expect when agency personnel face controversies of this kind, their responses were often ambiguous and in-

complete. Not until the agency issued the technical bulletin was the controversy officially and definitively resolved. If, as the AAR urges, the record in this case reflects a definitive interpretation of paragraph (c)(5), it would mean that an agency's initial, often chaotic process of considering an unresolved issue could prematurely freeze its thinking into a position that it would then be unable to change without formal rulemaking. Not only would this blur the distinction between definitive agency action and informal, uncoordinated communications, it would seriously hamstring agency efforts to interpret and apply their own policies. The Administrative Procedure Act requires no such result.

### III

In the final section of its brief, the AAR argues that the technical bulletin is "substantively invalid ... because the FRA's abrupt departure from its contemporaneous and consistent construction of the exclusive track occupancy provision is arbitrary and capricious." Except for the label "substantive," we see no difference between this claim and the procedural argument that we rejected in section II. The petition for review is denied.

*So ordered.*