State of ARIZONA, Plaintiffs,

v.

Donna E. SHALALA, Secretary of Health and Human Services, et al., Defendants.

No. CIV.A. 99–00860 (HHK).

United States District Court, District of Columbia.

Oct. 23, 2000.

**44**

Charles Alvin Miller, Covington & Burling, Washington, DC, for plaintiffs.

Felicia L. Chambers, U.S. Dept. of Justice, Washington, DC, for Donna E. Shalala, defendant.

Alfred W. Cortese, Jr., Cortese, PLLC, Washington, DC, for State of Florida, Intervenor-plaintiff.

## MEMORANDUM OPINION

KENNEDY, District Judge.

The States of Arizona, Maryland, New York, Tennessee, Michigan, and Florida[1] (collectively "plaintiffs") filed this action seeking declaratory and injunctive relief to prevent the enforcement of Action Transmittal 98–2 ("AT 98–2"), issued by the Secretary of the United States Department of Health and Human Services ("the Secretary" or "HHS") and the HHS Assistant Secretary for Management and Budget. Plaintiffs contend that AT 98–2, which applies existing government-wide cost allocation principles to the Temporary Assistance for Needy Families ("TANF") block grant program, was issued in violation of section 553 of the Administrative Procedure Act ("APA"), and is inconsistent with the TANF legislation. *See* 42 U.S.C. §§ 601 *et seq.* Before the court are the parties' cross motions for summary judgment. Upon consideration of the motions, the opposition thereto, and the record in

this case, the court concludes that there are no genuine issues of material fact in dispute and that defendants' motion for summary judgment must be granted. AT 98–2 does not exceed the Secretary's authority and is a valid interpretative guidance not inconsistent with the TANF legislation.

## I. FACTUAL BACKGROUND

The expansion of the administrative state and the broadened role of the federal government over the last several decades have had a profound impact on public assistance programs for persons in need. What was once a local endeavor, is now a cooperative effort between the federal government and the states. Three programs, Aid for Families with Dependant Children ("AFDC") (formerly Title IV of the Social Security Act), Medicaid (Title XIX of the Social Security Act) and the Food Stamp program (7 U.S.C. §§ 2011 *et seq.*), reflect this balance between federal and state responsibility. Because the three programs were essentially aimed at aiding the same population there were many commonalities in their administration. The AFDC cash assistance program imposed federal eligibility criteria, and individuals who qualified for AFDC cash assistance benefits under these criteria customarily qualified for Medicaid and Food Stamps as well. *See* 42 U.S.C. § 1396 and 7 U.S.C. § 2014. This linkage meant that the eligibility determination only needed to be calculated once, or in accounting terminology the AFDC eligibility determination "benefited" all three programs. Costs associated with activities that benefit multiple programs are known as common costs.

The 1996 enactment of The Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub.L. No. 104–193, 110 Stat. 2105 (1996) (often referred to as the "Welfare Reform Act"), drastically altered the federal/state bal-

---

1. The State of Florida was not an original plaintiff. On July 7, 1999 the court granted Florida's motion to intervene.

ance as well as the relationship between cash assistance, Medicaid, and Food Stamps. In an effort to increase the states' flexibility to manage their own public assistance programs, PRWORA repealed AFDC and replaced it with the TANF block grant program. Unlike AFDC, TANF is not an open-ended entitlement program. Rather, it provides limited federal block grants with which states administer their own cash assistance programs.

Pursuant to 42 U.S.C. § 603 eligible states receive block grants with amounts determined based upon recent federal spending on AFDC. In order to receive its TANF grant a state must submit to HHS, and obtain approval for, its state plan. *See* 42 U.S.C. § 602. To receive the full amount of the grant, however, a state must spend its own non-federal funds at no less than a specified percentage of its historic level of effort.[2] If a state fails to satisfy this maintenance of effort requirement ("MOE") the Secretary shall penalize the state by reducing its TANF grant in the following fiscal year by an amount equal to the shortfall. *See* 42 U.S.C. § 609(a)(7). States may use the TANF grants "in any manner that is reasonably calculated to accomplish the purpose of" the TANF program, or "in any manner that the State was authorized to use amounts received" under AFDC. 42 U.S.C. § 604(a). The statute imposes several specific limitations on grant spending, one of which requires that a state shall not spend more than 15 percent of its TANF grant for administrative purposes. *See* 42 U.S.C. § 604(b)(1).

The issue before the court centers on the allocation of common administrative costs between TANF, Medicaid, and Food Stamps. In allocating common costs between multiple federally-funded programs, HHS follows government-wide standards promulgated by the Office of Management and Budget ("OMB"). OMB Circular No. A–87 ("Circular A–87") "establishes principles for determining the allowable costs incurred by State, local, and federally-recognized Indian tribal governments (governmental units) under grants . . . with the Federal Government . . . . *The principles are for the purpose of cost determination* and are not intended to identify the circumstances or dictate the extent of Federal or governmental unit participation in the financing of a particular program or project." [3] Circular A–87 Attach. A, ¶ A.1 (emphasis added). The 1981 version of Circular A–87 required that costs be allocated between programs "to the extent of the benefits received." Circular A–87 Attach. A, ¶ C.2.a, 46 Fed.Reg. 9548 (Jan. 28 1981). In 1988 OMB contemplated several changes to Circular A–87, one of which was "moving away from methodologies that do not assign costs based on benefits received." Proposed Revisions to Circular No. A–87 "Cost Principles for State and Local Governments," 53 Fed.Reg. 40352 (Oct. 14, 1988). Subsequently, in 1995 OMB revised Circular A–87 to incorporate this change specifying that common costs are assignable to specific programs "in accordance with relative benefits received," and each activity which benefits from the cost "will receive an appropriate allocation." Circular A–87 Attach. A, ¶ C.3. This is referred to as the benefiting program allocation approach. The requirements of Circular A–87 are applicable

---

**2.** For fiscal years 1997 through 2002 the applicable percentage of the historic state expenditures is 80 percent, however, if a state meets the work participation rate requirements of 42 U.S.C. § 607(a) the percentage rate is reduced to 75 percent.

**3.** Circular A–87 falls within OMB's authority to provide government-wide policy guidance to federal agencies. *See* 31 U.S.C. § 1111(2); Executive Order No. 11,541, § 1. The principles contained in Circular A–87 date back to 1968 when the predecessor agency to OMB issued Federal Management Circular 74–4. *See* Declaration of Edward M. Tracy, Pls.' Mem. Supp. Summ. J. Ex. B ¶ 5 ("Tracy Decl."). Although Circular A–87 has been modified over the years its content has generally remained the same. Unless otherwise stated all references to Circular A–87 are to the 1995 version as amended in 1997.

to all federal programs except for those "with statutorily-authorized consolidated planning and consolidated administrative funding." *Id.*, Attach. A, ¶ A.3.e.

■ HHS has incorporated Circular A–87's principles by reference into its own regulations, *see* 45 C.F.R. § 74.27 and 45 C.F.R. § 92.22, and has issued several policy guidances instructing grant recipients as to its application. *See* OASC 10 "Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Grants and Contracts with the Federal Government", which was superseded in April 1997 by ASMB C–10 "Cost Principles and Procedures for Developing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government". HHS regulations require states receiving TANF funds to submit cost allocation plans detailing, *inter alia*, how common costs will be measured and allocated among all programs administered by the recipient. *See* 45 C.F.R. Part 95, Subpart E. During the existence of the AFDC program HHS routinely approved cost allocation plans that apportioned costs common to AFDC, Medicaid, and Food Stamps, entirely to AFDC. This accounting practice, where common costs are allocated exclusively to one program, is known as primary program allocation. HHS permitted primary program allocation because of the eligibility linkage between AFDC and the other two programs, and because the open-ended entitlement nature of the programs meant that states would receive the same amount of reimbursement no matter which allocation method was used. *See* Declaration of Joseph E. Cook, Jr., Defs.' Mem. Supp. Summ. J. Ex. 1 ¶ 7

("Cook Decl."). Defendants cite no specific statutory provision that explicitly permitted this deviation from the general policy of Circular A–87, rather they justify it based on "the legislative and appropriation history of these public assistance programs." *Id.* Even documents submitted by the plaintiffs demonstrate that "[t]here are … a number of indications in the legislation and legislative history … which appear to support the 'primary program' concept[.]" Tracy Decl. Ex. 1.[4] In essence HHS interpreted the AFDC legislation, in conjunction with the overall federal public assistance legislation, to permit such an exception.

This all changed following the passage of PRWORA in 1996 and the creation of TANF. On September 30, 1998 the Office of Grants and Acquisition Management ("OGAM") at HHS issued OGAM Action Transmittal 98–2. AT 98–2 was not promulgated pursuant to formal notice and comment rulemaking under section 553 of the APA. Consistent with earlier policy guidances AT 98–2 interpreted Circular A–87 and ASMB C–10 to require:

> [I]f any program benefits from an activity or cost, then costs must be allocated to each program. Where multiple programs are involved, a single program may not be designated as the sole benefiting program (primary program). Exceptions are described in the C–10, Section 2–12 which permit deviation from the A–87 requirements when the head of a Federal agency determines that the program legislation requires that the program absorb costs that would normally be allocable to other programs.

4. In a **footnote** defendants, without citing any authority, move to strike Mr. Tracy's declaration in its entirety because he allegedly attached to it privileged internal agency documents. *See* Defs.' Mem. Supp. Summ J. at 24 n. 16. Rule 7.1(a) of the Rules for the United States District Court for the District of Columbia requires all motions to be accompanied by "a statement of the specific points of law and authority that support the motion." LCvR 7.1(a). The D.C. Circuit Court has re-

peatedly summarized the logic underlying this rule noting that courts should "not address an 'asserted but unanalyzed' argument because … courts do not sit as self-directed boards of legal inquiry and research." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 613–14 (D.C.Cir. 2000) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983)). This court therefore, will not consider the defendants' motion to strike the Tracy Declaration.

Cost shifting is not permitted by most program statutes, except where there is a specific legislative provision allowing such cost shifting.

AT 98–2 ¶ 1. Applying this policy to the TANF legislation AT 98–2 ultimately concluded that:

> While the former AFDC program allowed such an exception, the TANF legislation that replaced AFDC does not permit it being designated as the sole benefiting or primary program. Therefore, the TANF program is subject to the cost allocation principles of A–87.[5]

*Id.* (emphasis added). Starting with state fiscal years beginning on or after October 1, 1998, cost allocation plans for the TANF program were required to comply with the benefiting program allocation method embodied in Circular A–87, ASMB C–10, and clarified in AT 98–2. *See Id.* ¶ 2. Plans prepared based on any other allocation method were required to be resubmitted. *See Id.*

Plaintiffs filed suit on April 5, 1999 asserting that AT 98–2 constituted a change in well-established HHS policy and as such should have followed the formal APA rulemaking process, and that it is inconsistent with the TANF legislation. They now seek summary judgment on their claims. Defendants seek summary judgment on the grounds that there is no final agency action, the matter is not ripe for adjudication, plaintiffs have failed to exhaust their administrative remedies, and that AT 98–2 is a valid interpretive guidance not subject to formal notice and comment rulemaking.

## II. ANALYSIS

### A. Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the movant is entitled to judgment as a matter of law. Facts "that might affect the outcome of the suit under the governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-movant's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant's evidence must be of a nature "that would permit a reasonable jury to find" in its favor. *Laningham v. Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987). Evidence that is "merely colorable" or "not significantly probative," is not sufficient to sustain a grant of summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. Finality, Ripeness, and Exhaustion

Defendants contend that AT 98–2 does not constitute final agency action subject to review under the APA, that plaintiffs have failed to exhaust the administrative remedies available to them, and that plaintiffs' claims are not ripe. Although essentially intertwined the three doctrines are distinct in that finality relates to the conclusion of action by the agency, exhaustion addresses the use of administrative remedies available to redress such action, and ripeness focuses on the fitness of issues for judicial review.[6]

---

**5.** Although defendants admit that AT 98–2 "does not fully flesh out its rationale," (it is less than two pages long) they maintain that it is a reasonable interpretation of the TANF legislation and Circular A–87. Defs.' Mem. Supp. Summ J. at 21.

**6.** This is an instance in which finality, ripeness, and exhaustion overlap to a significant extent. Defendants seem to argue that plaintiffs' claims are unripe because AT 98–2 is not a final action and administrative remedies were not exhausted. For a discussion of the overlap between finality, ripeness and exhaustion, *see Ticor Title Ins. Co., v. FTC*, 814 F.2d

Although defendants' arguments on these points have some merit, they ultimately must be rejected. AT 98–2 "*requires* plaintiffs to have submitted cost allocation plans (or amended cost allocation plans) for the State fiscal years beginning on or after October 1, 1998." Defs.' Mem. Supp. Summ. J. at 15 (emphasis added). If following submission of a revised or amended plan the Director of the Division of Cost Allocation notifies the state that its plan was disapproved, HHS may initiate a disallowance action. *See* 45 C.F.R. § 95.519. A state wishing to appeal a disallowance may file an appeal with the Departmental Appeals Board ("DAB"). *See* 45 C.F.R. Part 16 and Appendix A.

To date all plaintiffs have submitted revised cost allocation plans. Maryland's revised plan and Tennessee's revised plan were approved respectively on May 3, 1999, and May 24, 1999. As of December 3, 1999, HHS was still reviewing the other plaintiffs' revised or amended plans. *See* Second Cook Decl. ¶¶ 3, 4. Since HHS had yet to disallow any of plaintiffs' cost allocation plans, no appeals in this matter had been filed with the DAB. Accordingly defendants contend that because plaintiffs have not exhausted their administrative remedies by appealing to the DAB, no final order has been issued against them that may be appealed in this court and the case is, therefore, not ripe for adjudication.

 Before analyzing the ripeness and exhaustion claims it is necessary to first discuss finality. Judicial review under the APA is limited to review of final agency action. *See* 5 U.S.C. § 704; *Public Citizen v. USTR*, 5 F.3d 549, 551 (D.C.Cir. 1993). AT 98–2 is clearly a final agency action within the meaning of APA section 704. First, it is well established that an interpretative guidance issued without formal notice and comment rulemaking can

qualify as final agency action. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C.Cir.2000); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C.Cir.1988); *Ciba–Giegy Corp. v. EPA*, 801 F.2d 430, 435–38 (D.C.Cir.1986); *see also National Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C.Cir.1971) (applying a "limited presumption of preenforcement judicial review in the case of authoritative interpretive rulings"). A two-prong test has been articulated by the Supreme Court for use in determining whether an agency action is final. The action must first mark the "consummation" of the decisionmaking process, and second must determine "rights or obligations" or cause "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). AT 98–2 satisfies both of these finality components. It is not "of a merely tentative or interlocutory nature," but instead represents a definitive pronouncement. *Id.* Its language and subject matter are such as to indicate that HHS "has completed its decisionmaking process." *Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). The second prong of the *Spear* test is satisfied as well. Unequivocal language states that "cost allocation plans and indirect cost agreements for the TANF program must comply with this policy." AT 98–2 ¶ 2. This is a case in which the agency's pronouncement has "immediate consequences on those subject" to it. *International Union, United Auto., Aerospace & Agric. Implement Workers of America v. Brock*, 783 F.2d 237, 239 (D.C.Cir.1986). AT 98–2 was clearly intended to have immediate impact upon the affected states. In requiring that "plans prepared on a basis other than benefiting program must be resubmitted," AT 98–2 led states to believe that non-complying

731, 745 (D.C.Cir.1987) (Williams, J.) ("Problems of finality are in the area where the law of exhaustion joins or overlaps with the law of ripeness.") (quoting 4 K. Davis, *Administrative Law Treatise* § 26:10, at 458 (2d

ed.1983)). It should also be noted that while "exhaustion and ripeness are judge-made prudential doctrines," finality is a jurisdictional element. *Ticor*, 814 F.2d at 746.

plans would not be approved, and that for all practical purposes its interpretive statement was binding. AT 98–2 ¶ 2. Therefore, AT 98–2 is a final agency action subject to review under the APA.

■ Even though AT 98–2 was intended to be the agency's final decision regarding the application of the benefiting program allocation method to TANF grants, the question remains whether plaintiffs' claims are ripe prior to a DAB appeal. The ripeness doctrine is characterized as "a prudential attempt to balance the interests of the court and the agency in delaying review against the petitioner's interest in prompt consideration of allegedly unlawful agency action." *Florida Power & Light Co. v. EPA,* 145 F.3d 1414, 1420–21 (D.C.Cir.1998) (quoting *Cronin v. FAA,* 73 F.3d 1126, 1131 (D.C.Cir.1996)) (internal quotation marks and citations omitted). In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court established a two-part test that requires this court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." If after applying this standard the court determines that "the interests of the court and agency in postponing review outweigh the interests of those seeking relief, settled principles of ripeness squarely call for adjudication to be postponed." *National Ass'n of Regulatory Utility Comm'rs v. DOE,* 851 F.2d 1424, 1428 (D.C.Cir.1988) (quoting *State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d 474, 480 (D.C.Cir.1986)). If the agency policy at issue is "is likely to be abandoned or modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision." *Continental Air Lines, Inc. v. Civil Aeronautics Board,* 522 F.2d 107, 125 (D.C.Cir.1974).

■ The two-prong test expressed in *Abbott Laboratories* seeks to prevent judicial intervention "until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. 1507. However, where a case "raises a purely legal question, threshold suitability for judicial determination is assumed." *Maryland Dept. of Human Resources v. Sullivan,* 738 F.Supp. 555, 561 (D.D.C.1990) (quoting *Eagle–Picher Indus. v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985)).

The controversy in this case is similar to the one at issue in *Maryland Department of Human Resources.* There a Maryland agency appealed an HHS funding decision to the DAB. The DAB remanded part of the claims and Maryland subsequently filed suit asserting that the challenged program instruction, PI 82–06, was a legislative rule which should have been issued after notice and comment rulemaking. Because the DAB remanded the appeal "no final administrative decision exist[ed]." *Maryland Dept. of Human Resources,* 738 F.Supp. at 561. Despite the lack of a final administrative decision, the court held that the plaintiffs were not challenging specific eligibility determinations but rather "raised a purely legal question as to whether defendants must have adhered to notice and comment procedures before they properly could use PI 82–06." *Id.* Applying the analysis set forth in *Abbott Laboratories* and *Eagle–Picher,* the court concluded that "the issue of whether PI 82–06 was a legislative or interpretive rule [was] ripe for review." *Id.* Similarly, in this case plaintiffs are not challenging specific disallowance decisions, but rather the validity of AT 98–2 —— a purely legal issue.

■ One basis for requiring the exhaustion of administrative remedies is that even if the court ultimately reviews the agency decision it has the benefit of examining the factual record developed by the agency. *See Committee of Blind Vendors of District of Columbia v. District of Columbia,* 28 F.3d 130, 133 (D.C.Cir.1994). The legal challenge to AT 98–2 can be

resolved now and will not be aided by further developing the factual record at the agency level. When the logic supporting the exhaustion doctrine is not applicable, a plaintiff's failure to exhaust administrative remedies may be excused. *See id.* at 133 n. 5. Dismissing this case pending an appeal to the DAB would not "bring the issues into greater focus or assist in determining them." *Barrick Goldstrike Mines, Inc., v. Browner,* 215 F.3d 45, 49 (D.C.Cir. 2000). Forcing plaintiffs to submit cost allocation plans in violation of AT 98–2 so that they could then defend disallowance actions in front of the DAB by raising the same legal arguments raised here would not be prudential. *See id.; Metropolitan Sch. Dist. of Wayne Tp. v. Davila,* 969 F.2d 485, 489 (7th Cir.1992).

Also, under the second prong of the *Abbott Laboratories* test, plaintiffs will face substantial hardship if judicial review is denied. Compliance with AT 98–2 requires allocation of administrative costs between all benefiting programs, which would force states to add millions of dollars to their Medicaid and Food Stamp programs or risk severe penalties. *See* Pls.' Reply Mem. Supp. Summ. J. at 20.

Having determined that AT 98–2 is a final agency action under the APA, and that the plaintiffs need not have first appealed to the DAB before filing this suit, the court concludes that the issues raised in this case are ripe for judicial review.

## C. Failure to Use the Formal Rule-making Process

 Section 553 of the APA requires agencies to follow the notice and comment process before announcing final rules.[7] The section, however, specifically exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from these rulemaking requirements. 5 U.S.C. § 553(a)(3)(A). Although it can be diffi-

cult to distinguish between legislative rules and interpretive rules, *see Syncor International Corp. v. Shalala,* 127 F.3d 90, 93 (D.C.Cir.1997) (recognizing the difficulty in telling a substantive rule from an interpretive one); *Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579, 587 (D.C.Cir.1997) (same); *American Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1108–09 (D.C.Cir.1993) (same); *American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987) (describing the distinction between the two types of rules as a "hazy continuum"), the Supreme Court has repeatedly defined interpretive rules as those "issued by an agency to advise the public of the agency's construction of the statutes and the rules which it administers." *See Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)). As such, an interpretive rule "states what the administrative agency thinks the statute means, and only reminds affected partes of existing duties." *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984) (internal quotations omitted). If the rule merely restates duties already contained in existing regulations, rather than spelling out new obligations, it may be considered interpretive and not subject to the requirements of APA section 553. *See Appalachian Power Co.,* 208 F.3d at 1024; *Ruckelshaus,* 742 F.2d at 1565.

 AT 98–2 qualifies as an interpretive rule under the Supreme Court's definition. As opposed to a legislative rule, which creates new laws or imposes new obligations, AT 98–2 simply interprets existing obligations in light of the newly enacted TANF program. After discussing the cost allocation methods required by Circular A–87 and ASMB C–10, it con-

---

7. Although formal notice and comment rulemaking does not apply to decisions regarding federal grant programs, in 1971 HHS announced it would follow notice and comment for these programs. *See* 5 U.S.C. § 553(a)(2); 36 Fed.Reg. 2532 (Feb. 5, 1971).

cludes that unlike the AFDC legislation, the TANF legislation does not provide an exception from the existing cost allocation requirements. This interpretation of how existing regulations impacted the new TANF program is a classic interpretive rule. As an interpretive rule, AT 98–2 was therefore exempt from the APA's notice and comment rulemaking procedures.

▮ Plaintiffs contend, however, that even if AT 98–2 is an interpretive rule it should have been issued pursuant to the section 553 requirements because it marked a departure from prior well-established HHS policy. Under the previous AFDC regime, HHS consistently approved cost allocation plans that utilized the primary program allocation method. Plaintiffs argue, therefore, that HHS cannot decide to switch exclusively to the benefiting program allocation method without following the formal notice and comment process.

▮ It is settled in this circuit that allowing "an agency to make a fundamental change in its interpretation of a substantive regulation without notice and comment obviously would undermine" APA rulemaking requirements. *Paralyzed Veterans,* 117 F.3d at 586. An existing policy need not rise to the level of a formal rule in order to require notice and comment procedures for its modification. In *Alaska Professional Hunters Ass'n, Inc. v. FAA,* 177 F.3d 1030, 1034–36 (D.C.Cir.1999), the Court of Appeals held that consistent policy guidance given out by staff in the FAA's Alaska Region for almost thirty years constituted an authoritative interpretation that could be changed only through notice and comment. The plaintiffs in *Alaska Professional Hunters* relied on the advice provided by FAA officials for three decades. The FAA's position was also reflected in official agency adjudications during that same period. *Id.* at 1031. Compare this to *Association of American Railroads v. DOT,* 198 F.3d 944, 949–50 (D.C.Cir.1999), which upheld an informal interpretive technical bulletin

in a case where the plaintiffs had not relied on prior agency interpretation and no formal agency decisions were inconsistent with the bulletin.

The present case, however, more closely resembles *Association of American Railroads.* Contrary to plaintiffs' assertions, AT 98–2 marks neither a "drastic change" nor a "radical departure" from the agency's prior guidance. Pls.' Reply Mem. Supp. Summ J. at 13–14. In April 1997, well over a year before At 98–2 was announced, HHS issued guidance ASMB C–10 to clarify the requirements of Circular A–87 following its 1995 revision. ASMB C–10 states that under Circular A–87, "[a] cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to that cost objective according to the relative benefits received. *All activities which benefit* from the governmental unit's indirect costs … will receive an appropriate allocation of indirect costs." ASMB C–10 ¶ 2.8.2 (emphasis omitted and emphasis added). It goes on to describe in more explicit detail the requirements of Circular A–87 and the exceptions to those requirements:

> Circular A–87 requires that where a cost or activity benefits multiple activities or programs, those costs must be allocated in accordance with the relative benefits received by each activity or program. This requirement is an underlying principle of cost allocation. Exceptions to this requirement are permissible only under certain circumstances. If an awarding agency determines that costs allocable to another program or cost objective are allowable under their program, then the unallocable costs may be bourne by their program. This shifting of unallocable costs is permitted only when the head of the awarding agency advises the cognizant agency that under its enabling legislation, such cost shifting is allowed and expected. In the absence of such authorization, costs must be allocated to all benefiting programs.

*Id.* ¶ 2–12. Finally, in language that could not be more clear, it concludes, "[t]he notion of 'primary program' is contrary to the allocability provisions of A–87 .... [and absent notification to the contrary] may not be used." *Id.* ¶ 2–13. AT 98–2 simply follows this interpretation of revised Circular A–87. It states that the TANF legislation does not allow an exception to the benefiting program allocation method, and therefore TANF cost allocation plans may not use the primary program method. This policy is wholly consistent with the language of both Circular A–87 and ASMB C–10.

Additionally, plaintiffs' reliance on the agency's approval of primary program allocation under the AFDC program, *see* Pls.' Mem. Supp. Summ. J. at 25 and Tracy Decl. ¶ 9, fails to advance their argument. In 1996, PRWORA repealed AFDC and replaced it with TANF. Unlike the AFDC program, TANF eligibility is delinked from Medicaid and Food Stamp eligibility. The prior application of Circular A–87 was based on an interpretation of the AFDC enabling legislation as well as earlier versions of Circular A–87. AT 98–2, however, is the Secretary's first interpretation of the of the newly enacted TANF legislation as it relates to the then-recently revised Circular A–87. As such AT 98–2 does not rescind or modify earlier HHS policy and was, therefore, validly issued without notice and comment.[8]

## D. Substantive Validity of AT 98–2

Having determined that AT 98–2 was validly issued without notice and comment, the court's focus shifts to addressing plaintiffs' challenge of its substantive validity. *See generally American Mining Congress,* 995 F.2d at 1113 (recognizing the difference between "deciding whether an interpretation is an amendment of a legislative rule" and "deciding the substantive validity

of that interpretation"). Plaintiffs attack the validity of AT 98–2 asserting that it is inconsistent with the TANF legislation in several different respects. They claim first that it improperly restricts the manner in which states use their TANF funds, second that it also impermissibly limits how states may meet their MOE requirements, and third that AT 98–2 violates the limitation on federal authority in the TANF legislation. *See* Pls.' Mem. Supp. Summ. J. at 12, 15, 16.

The standard to be applied by the court in reviewing agency interpretation of legislation is the well-known two-part inquiry articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, when "Congress has directly spoken to the precise question at issue" the court must respect Congressional intent. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. Second, if the court finds Congress has not specifically confronted the question it must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. Where Congress has entrusted an agency to administer a statute or program the agency has the latitude to formulate policy and make rules necessary "to fill any gap left, implicitly or explicitly, by Congress." *Id.* (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270(1974)). If the agency has filled the gap in a reasonable manner given legislative intent then the agency's judgment must be given "controlling weight." *Id.* at 844, 104 S.Ct. 2778; *see also NationsBank of North Carolina, N.A., v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995); *Syncor,* 127 F.3d at 94.

---

8. AT 98–2 was not, however, issued completely without communication between HHS and the states. As early as May 1997 states were pressing HHS to issue an interpretive guidance detailing how Circular A–87 applied to

TANF. At least some states were advocating for an interpretation applying the benefiting program methodology to TANF. *See* Cook Decl. ¶ 13 and Exs. F & G.

■ Slightly more deference is given to HHS when construing the Social Security Act. Given the complexity of the Social Security Act, Title IV of which contains TANF, courts have stated there is a special need to defer to the Secretary's interpretation. *See Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981); *see also Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C.Cir.1994) (recognizing "heightened deference to the Secretary's interpretation" of a complex and regulatory program like Medicare); *White v. Shalala*, 7 F.3d 296, 300 (2d Cir.1993) (because of the Act's "byzantine construction" courts should give deference to the Secretary's interpretation of the Act "as long as it is a permissible interpretation"); *Friedman v. Berger*, 547 F.2d 724, 727 n. 7 (2d Cir.1976), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977) ( Friendly, J.) (commenting that the Act and its regulations are "almost unintelligible to the uninitiated").

■ Plaintiffs contend that the language of the TANF legislation "addresses with unmistakable clarity the question of whether states can use TANF funds to cover common costs." Pls.' Mem. Supp. Summ. J. at 12. Four sections of the law, sections 601, 604, 609 and 617, are primarily implicated in this discussion. Under section 604(a), states may spend TANF funds "(1) in any manner that is reasonably calculated to accomplish the purpose of this part, including to provide low income households with assistance in meeting home heating and cooling costs; or (2) *in any manner that the State was authorized to use amounts received under [AFDC or JOBS]*, as such parts were in effect on September 30, 1995, or (at the option of the State) August 21, 1996." 42 U.S.C. § 604(a) (emphasis added). Plaintiffs contend that even if common costs also benefit the Medicaid and Food Stamp programs, they are nonetheless "reasonably calculated" to accomplish the purpose of TANF and permitted under section

604(a)(1). Also, since under the AFDC program HHS routinely approved the allocation of common administrative costs exclusively to AFDC, plaintiffs further assert that section 604(a)(2) allows them to continue allocating costs in this fashion. While facially appealing, neither of these contentions is persuasive.

First, although section 604(a)(1) allows funds to be spent in any manner "reasonably calculated to accomplish the purpose of this part," this must be considered in light of section 601(a) which describes the purpose of TANF as,

> to increase the flexibility of States in operating a program designed to -
>
> (1) provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives;
>
> (2) end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage;
>
> (3) prevent and reduce the incidence of out-of-wedlock pregnancies and establish annual numerical goals for preventing and reducing the incidence of these pregnancies; and
>
> (4) encourage the formation and maintenance of two-parent families.

42 U.S.C. § 601(a). Although the purpose of TANF is clearly expressed, HHS must still decide what expenditures are "reasonably calculated" to accomplish the clearly expressed language of this section. Since nothing in this section supports a finding that paying administrative costs for Medicaid and Food Stamps is "reasonably calculated" to accomplish the purpose of TANF, *Chevron* deference should be given to the Secretary's reasonable determination that allocating common administrative costs exclusively to TANF is inconsistent with section 604(a)(1).

■ Plaintiffs' argument regarding section 604(a)(2) is more appealing, but is still not compelling. Under section 604(a)(2), states may spend TANF funds in any manner in which they were "autho-

rized to use amounts received under [AFDC]." 42 U.S.C. § 604(a)(2). Congress has not spoken to the precise question at issue because the Secretary must still determine what constituted *authorized* expenditures under the AFDC program, and therefore part one of the *Chevron* test is not met. Given the ambiguity in the statute the court must decide if the Secretary's interpretation is a "permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 (Part II). The Secretary interpreted this provision to cover activities that are not permissible under 42 U.S.C. § 604(a)(1), but were authorized under "a State's approved State AFDC plan, JOBS plan, or Supportive Services Plan as of September 30 1995, or at State option August 21, 1996." 64 Fed.Reg. 17720, 17839 (Apr. 12, 1999). Integral to this interpretation is the distinction between state plans, which are programmatic in nature, and costs allocation plans, which deal with accounting methods. Defendants maintain that cost allocation plans have never been considered part of, and were approved separately from, state AFDC plans. *See* Defs.' Mem. Supp. Summ. J. at 35; Storrs Decl. ¶¶ 8, 9; Defs.' Statement of Material Facts Not in Dispute ¶ 5. This distinction arises from the fundamental difference between the plans. State AFDC plans detail programmatic activities, and costs allocation plans outline accounting practices. Plaintiffs present no evidence to contest the notion that state AFDC plans and costs allocation plans have always been treated differently as suggested by defendants. The Secretary's interpretation is largely based on the reasonable distinction between funding authorized under state plans and accounting practices approved in cost allocation plans.

An examination of the entire legislative scheme also supports the conclusion that the Secretary's interpretation of section 604(a)(2) is reasonable and satisfies part two of the *Chevron* inquiry. First, the conference report on PRWORA indicates that permissible uses of TANF funds are those "reasonably calculated" to accomplish its purpose, "including *activities* now authorized under" AFDC. H.R. Conf. Rep. No. 104–430, at 320 (1995) (emphasis added). This language supports the distinction drawn by the Secretary between authorized programmatic expenses, and accounting principles utilized for allocating expenses between programs. While plaintiffs' interpretations of TANF may present reasonable alternatives, ultimate discretion for reimbursing costs is left with the Secretary. *See generally State of New York by Perales v. Sullivan,* 894 F.2d 20, 27 (2d Cir.1990). Moreover, HHS's interpretation "need not be the only reasonable one to gain judicial approval." *Connecticut Dept. of Income Maintenance v. Heckler* 471 U.S. 524, 532, 105 S.Ct. 2210, 85 L.Ed.2d 577 (1985); *see also New York v. Shalala,* 959 F.Supp. 614, 621 (S.D.N.Y.1997).

Second, section 604(b)(1) sets a 15 percent limit on the amount of a state's TANF grant funds that may be used for administrative purposes. As the Secretary properly concluded, it is reasonable to surmise that Congress was concerned about excessive spending on administrative costs and "that it did not wish for Medicaid and Food Stamp costs to help erode the grant." Defs.' Reply Mem. Supp. Summ. J. at 21. This conclusion is reinforced by looking at section 502 of the Agricultural Research Extension and Education Reform Act of 1998, which modified federal reimbursement of administrative costs associated with the Food Stamp program. Pub.L. No. 105–185 (1998). This section requires the Secretary to determine the amount of certain administrative costs previously allocated by states to AFDC, that could have been allocated to the Food Stamp program. *See* 7 U.S.C. § 2025(k). In fiscal years 1999 to 2002 the Department of Agriculture is then instructed to reduce reimbursements of administrative costs in the Food Stamp program by the amount determined by the Secretary. The legislative history suggests that section

502 was intended to "[m]ake clear that no TANF funds, ... may be used to replace reductions being made by the Secretary of Agriculture" to reimbursement of Food Stamp administrative costs. H.R. Conf. Rep. No. 105–492, at 117 (1998). Plaintiffs are certainly correct that section 502 does not prevent continued use of the primary program allocation system, *see* Pls.' Mem. Supp. Summ. J at 22, and while defendants overstate its importance they properly suggest that it does provide "additional support for the proposition that Congress evinced an intent that each program bear its fair share of administrative costs." Although by itself this provision is hardly dispositive, when viewed in conjunction with the legislative history and the 15 percent cap on TANF administrative spending, it provides an additional basis for the Secretary's already reasonable interpretation of section 604(a)(2).

■ Plaintiffs next assert that AT 98–2 is inconsistent with the MOE requirement contained in section 609 of TANF. In establishing the MOE requirement section 609 also states what expenditures qualify as MOE. To qualify funds must be spent on: (aa) cash assistance to families; (bb) child care assistance; (cc) certain employment related educational activities; (dd) administrative costs associated with the aforementioned activities to the extent they do not exceed 15 of total qualified expenditures; or (ee) "[a]ny other use of funds allowable under section 604(a)(1) of this title." 42 U.S.C. § 609(a)(7)(B)(i)(I). Since expenditures on common administrative costs clearly do not fall into one of the first four delineated categories of MOE spending contained in section 609, plaintiffs primarily rely on the fifth option, asserting that since common administrative costs serve the purpose expressed in sections 604 and 601, mandatory allocation of such costs between all participating programs impermissibly regulates how states meet their MOE requirement. This argument, however, suffers from the same flaws as the points discussed above. The

Secretary's reasonable interpretation that the purpose of the statute does not include spending on common administrative costs is entitled to *Chevron* deference.

■ Almost as a catchall, plaintiffs also maintain that AT 98–2 is invalid because section 617 of TANF prohibits the federal government from regulating "the conduct of States under this part or enforc[ing] any provision of this part, except to the extent expressly provided in this part." 42 U.S.C. § 617. This argument, however, must also fail. Defendants base AT 98–2 in the Secretary's section 609 obligation to impose penalties when funds have been used in violation of TANF, or when states fail to meet their MOE requirements. *See* 42 U.S.C. §§ 609(a)(1)(A), 609(a)(7)(A). Inherent in the ability to enforce these provisions is the authority to determine when a violation has occurred. AT 98–2 is not a regulation within the meaning of section 617, but rather a pre-enforcement interpretive guidance stating what HHS would consider to be a violation of TANF subject to penalties under section 609. As already determined the Secretary's interpretation that allowing TANF funds to defray common administrative costs would be inconsistent with the law is valid. Therefore, despite the section 617 limitation on federal authority, AT 98–2 is authorized by the TANF legislation and is a valid interpretation of that legislation.

## III. CONCLUSION

For the foregoing reasons, plaintiffs' motion from summary judgment is denied and defendants' motion for summary judgment is granted. An appropriate order accompanies this memorandum.

## ORDER AND JUDGMENT

Pursuant to Fed.R.Civ.P. 58 and for the reasons stated by the court in its memorandum docketed this same day, it is this 23rd day of October, 2000 hereby

**ORDERED** and **ADJUDGED** that judgment is entered in favor of the defendants; and it is further

**ORDERED and ADJUDGED** that the complaint in this case is dismissed.