**BROWN & WILLIAMSON TOBACCO CORPORATION, and BWTDirect, LLC, Plaintiffs,**

v.

**George E. PATAKI, in his official capacity as Governor of the State of New York, et al., Defendants**

No. 00 CIV 7750 LAP.

United States District Court, S.D. New York.

Feb. 26, 2001.

Laurence A. Silverman, Mark P. Gimbel, Covington & Burling, New york City, for plaintiffs.

James M. Hershler, Eliot Spitzer, Atty. General, New york City, Martin Bienstock, Office of Atty. Gen., New York City, for defendants.

*MEMORANDUM AND ORDER*

PRESKA, District Judge.

Defendants George E. Pataki, in his official capacity as Governor of the State of New York, Eliot Spitzer, in his official capacity as Attorney General of the State of New York, and Antonia C. Novello, M.D., in her official capacity as Commissioner of Health of the State of New York (collectively, the "defendants") bring this motion to disqualify the law firm of Covington & Burling ("C & B") as counsel for plaintiffs Brown & Williamson Tobacco Corporation and BWTDirect, LLC (collectively, "Brown & Williamson") in the above-captioned action. For the reasons

set forth below, the motion to disqualify is denied.

## BACKGROUND

### I. C & B's Relationship with New York State

The following facts are not in dispute. Over the past 25 years, C & B has represented various New York State (the "State") interests with respect to the State's social welfare programs. The State first entered into a contract with C & B in 1975. (Attwell Aff. ¶ 4). In 1987, C & B and the State executed a contract, which was subsequently renewed every three years. (*Id.* ¶ 2). The current contract between the parties was executed in July 2000 and will terminate on March 31, 2001, subject to the State's right to renew it for an additional year. (*Id.* ¶ 3; *id.*, Ex. A at 6–7).

Under the current contract between C & B and the Division of Budget ("DOB"), C & B provides legal advice and assistance, including representation in litigation, on behalf of the State on issues of federal funding, rate structures and revenue maximization for the State's public assistance programs, including Medicaid, cash assistance, foster care, and child support. (*Id.*, Ex. A ¶¶ 4, 9). As a necessary part of this work, C & B interacts with several State agencies, including the Office of Mental Retardation and Developmental Disabilities ("OMRDD"), the Office of Mental Health ("OMH"), the Office of Temporary and Disability Assistance ("OTADA"), the Department of Social Services ("DSS"), and the Department of Health ("DOH"). (*Id.* ¶ 8).

From 1997 through the third quarter of 2000, C & B billed the State as follows: $72,623 in 1997; $93,246 in 1998; $133,100 in 1999; and $47,359 through the third quarter of 2000. (*Id.* ¶ 7). Under the contract, payment to C & B is "limited to legal services rendered for those matters specifically set forth in [the contract], and [C & B] shall not be entitled to payment for any other services except as may be entered into by and between the parties hereto." (*Id.*, Ex. A at 5).

On April 5, 1999, C & B filed a complaint in *Arizona et al. v. Shalala,* No. 99 Civ. 860(HHK), on behalf of five states, including New York, seeking declaratory and injunction relief against the Secretary of Health and Human Services ("HHS") and the HHS Assistant Secretary for Management and Budget to prevent enforcement of a federal policy restricting how states can use block grants under the Temporary Assistance for Needy Families program. (Robitzek Aff. ¶ 10; *id.*, Ex. A). On October 23, 2000, the district court granted summary judgment to the defendants, *Arizona et al. v. Shalala,* 121 F.Supp.2d 40 (D.D.C.2000), and on December 20, 2000, C & B filed a notice of appeal. (*Id.* ¶ 10). As part of this representation, C & B has consulted with the New York State DOB and OTADA. (Remes Aff. ¶ 5).

### II. Private Representation

Over the years, C & B has also represented numerous and varied private interests, some of which involved parties adverse to the New York State Attorney General, Governor or DOH. (*Id.* ¶ 8). For example, C & B has represented food manufacturers against the Commissioner of Agriculture and Markets in cases involving the misbranding of food products; C & B has been adverse to the Attorney General in the contest over Doris Duke's will, (*id.* ¶ 9); and C & B has represented private companies in many environmental matters involving the New York Department of Environmental Conservation, including representation of a PCB manufacturer

spanning more than a decade (*id.* ¶ 10). C & B has also represented clients in civil and criminal cases instituted by the Attorney General's Office and other state agencies. (*Id.* ¶ 11).

Of particular significance for purposes of this motion is C & B's representation of tobacco companies in matters adverse to various state agencies, and known to the Attorney General, the Office of the Governor, and DOH. (*Id.* ¶ 12). For example, C & B represented several tobacco companies and met with the Office of the Governor's Counsel in May 2000 to urge that the Governor disapprove the original "fire-safe" cigarette bill, which the Governor vetoed on May 24, 2000. After the Governor signed the successor bill on the "fire-safe" cigarette, a C & B attorney met with three officials of the State Office of Fire and Prevention and Control ("OFPC") on September 14, 2000 about implementation of the statute. The C & B attorney met again with the officials of OFPC and officials from DOH and the Department of State on October 10, 2000. (*Id.* ¶ 13).

Despite its representation of interests adverse to the State, "no state official or agency over the past three decades has objected to, or sought to disqualify [C & B] with regard to, any [matters C & B has represented against the State]." (*Id.*). From time to time, however, C & B has raised with the State the fact that C & B represents the State on various issues while it represents private clients against the State on other issues. For example, a C & B attorney met with the State Attorney General in March 1995 on behalf of the four leading cigarette manufacturers in

an effort to urge the Attorney General not to join other states in suing the cigarette companies for reimbursement of smoking-related Medicaid costs. (*Id.* ¶ 12(a); Schick Decl., Ex. D at 3). When the Attorney General filed suit against the manufacturers, C & B, "as a courtesy," advised DOB that it had represented the Tobacco Institute for many years and would possibly represent the defendants in the litigation. (Remes Aff., ¶ 12(a)). C & B did not believe that this dual representation of the tobacco companies and the State would constitute a conflict of interest, and "[n]o State official raised any objection to [C & B's] continued representation of the tobacco defendants," (*id.*), despite the fact that C & B represented the State on Medicaid issues and would be representing the Tobacco Institute and the manufacturers against the State in its effort to recoup smoking-related Medicaid costs.[1] Additionally, pursuant to the Master Settlement Agreement between the tobacco manufacturers and the Attorneys Generals of 46 states, C & B negotiated with the New York Attorney General's Office the dissolution of the Tobacco Institute. (*Id.* ¶ 12(b)).

### III. Current Litigation Against the State

On October 12, 2000, C & B filed the complaint in *Brown & Williamson, et al. v. Pataki, et al.,* 00 Civ. 7750(LAP), in this court.[2] On October 16, 2000, the Wall Street Journal ran a story on Brown & Williamson's suit to block enforcement of New York State Public Law 1399–11 ("P.L.1399–11"), which prohibits the sale of

---

1. On another occasion, C & B sought and received the State's permission to represent New York City in a case in which the City and State were co-defendants. It was determined that the City and State had mutual interests in the case, and, therefore, the State consented to C & B's representation of the City.

2. The companion case, *Santa Fe Natural Tobacco, Inc. v. Spitzer, et al.,* 00 Civ. 7274(LAP), had been filed and served on September 26, 2000.

cigarettes to New York State residents via mail order, telephone and the internet. A C & B partner, David H. Remes, was mentioned in the article by name, but the firm was not. (Remes Aff., Ex. D). On October 30, 2000, The National Law Journal ran a short piece on "new business" stating that C & B "[is] representing [Brown & Williamson] in a suit to overturn" P.L. 1399–11. (*Id.*, Ex. E).

The first scheduling order was issued on October 23, 2000 setting dates for expedited discovery, briefing and the preliminary injunction hearing. The time from the beginning of discovery to oral argument was to be just over seven weeks.[3] On November 14, 2000, an order (the "TRO") was issued temporarily restraining enforcement of P.L. 1399–11, and on November 15, 2000, a second scheduling order was issued setting dates for discovery, briefing and the preliminary injunction hearing. The time between the beginning of discovery to the expiration of the TRO was to be approximately four and a half months.[4]

In November 2000, Brown & Williamson, through C & B, noticed the depositions of two attorneys who work in the Office of the Governor's Counsel. Assistant Attorney General Martin Bienstock advised C & B that those depositions were protected by the legislative privilege. (Bienstock Reply Aff. ¶ 2). The parties had several conversations but were unable to resolve the issue. (*Id.* ¶ 3). During these conversations, Assistant Attorney General Beinstock stated several times that plaintiffs' attempt to depose State counsel staff was causing "significant displeasure." (Gimbel Aff. ¶¶ 4, 6). On December 13, 2000, Brown & Williamson submitted a letter brief to the court requesting the court to compel the depositions. (*Id.* ¶ 7; Bienstock Reply Aff. ¶ 4; *id.*, Ex. A). After considering the submissions from both sides, the deposition notices were quashed on December 15, 2000.

Forty-five minutes after Brown & Williamson submitted its letter brief to the court seeking to compel the depositions, Assistant Attorneys General Beinstock and Avi Schick informed C & B that defendants would move to disqualify the firm as

---

**3.** The October 23, 2000 Scheduling Order provided, among other things, that discovery was to begin on October 23, 2000, the preliminary injunction hearing was to be held on November 27, 2000, and oral argument was to heard on December 13, 2000.

**4.** The November 15, 2000 Scheduling Order, provided, among other things:

Discovery requests may be served beginning October 23, 2000. The time to produce documents and otherwise respond to any discovery requests is shortened from 30 days to 15 days, including weekends and holidays. Each party is to identify its fact and expert witnesses, provide a summary of the testimony of each expert, and specify the dates (on or before December 22, 2000) on which each of its witnesses is available for deposition by November 9, 2000 or such other dates as the parties agree to. Depositions are to be scheduled by consent on or before November 15, 2000 or such other

date as the parties agree to. Lists of exhibits and witnesses, motions in limine, stipulations, and any pre-hearing statements required by the Court are to be filed and served by January 8, 2001 or such other dates as the parties agree to. A preliminary injunction hearing is to be conducted on February 6, 2001. Prior to or at that time the Court will consider whether the trial on the merits should be advanced and consolidated with the preliminary injunction hearing. Plaintiffs' memoranda of law in support of an injunction are to be filed and served by February 15, 2001. Defendants' memoranda of law in opposition are to be filed and served by February 23, 2001. Plaintiffs' reply memoranda of law are to be filed and served by March 2, 2001. Oral argument is to be held on March 9, 2001 at 10:00 AM. The TRO shall expire on March 16, 2001 at 5:00 PM.

counsel for Brown & Williamson. (Remes Aff. ¶ 14). C & B offered to establish a "concrete wall" to shield its work on behalf of the State from its representation of Brown & Williamson; this offer was rejected. (Pl. Mem. at 19). Defendants filed and served the motion to disqualify on January 18, 2001, consistent with the third scheduling order.[5] Oral argument on the disqualification motion was heard on February 16, 2001.

## DISCUSSION

### I. STANDARD FOR DISQUALIFICATION

It is axiomatic that a lawyer owes an undivided duty of loyalty to his or her client. Under Canon 5 of the New York Code of Professional Responsibility, "a lawyer should exercise independent professional judgment on behalf of a client." DR 5-105(A) requires a lawyer to refuse employment if representation of an existing client "will be or is likely to be adversely affected by the [lawyer's representation of another client], or if it would be likely to involve the lawyer in representing differing interests." Additionally, under Canon 9, "a lawyer should avoid even the appearance of impropriety."

In *Cinema 5 Ltd. v. Cinerama, Inc., et al.*, 528 F.2d 1384, 1387 (2d Cir. 1976), the Court of Appeals held that adverse concurrent representation against an existing client is prima facie improper. The prima facie (or per se) rule shifts the burden to the attorney opposing disqualification to demonstrate that "there is no actual or apparent conflict in loyalties or diminution in the vigor of [the attorney's] representation." *Id.*

[W]ith rare exceptions disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation ... thus giving his present client an unfair advantage.

.    .    .    .    .

[W]e believe that unless an attorney's conduct tends to "taint the underlying trial by disturbing the balance of the presentations in one of the two ways indicated above, courts should be quite hesitant to disqualify an attorney".

*Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d

5. The January 17, 2001 Scheduling Order provided, among other things:

Disqualification Motion: Defendants' motion to disqualify and the memorandum in support shall be filed and served by January 18, 2001. Any discovery on Defendants' motion shall be completed by January 26, 2001. Plaintiffs' memorandum of law in opposition shall be filed and served by February 7, 2001. Defendants' reply memorandum shall be filed and served no later than February 12, 2001. Oral argument on Defendants' motion to disqualify shall be held on February 16, 2001 at 9:00 AM. Preliminary Injunction: All discovery is to be completed by April 10, 2001. Prelimi-

nary injunction hearing is to be conducted beginning April 30, 2001. Plaintiffs' memoranda of law in support of an injunction and proposed findings of fact and conclusions of law are to be filed and served by May 10, 2001. Defendants' memoranda of law in opposition and proposed findings of fact and conclusions of law are to be filed and served by May 18, 2001. Plaintiff's reply memoranda of law are to be filed and served by May 25, 2001. Oral argument on the injunction motion is to be held on May 30, 2001. The TRO shall expire at 12:01 AM on June 8, 2001.

Cir.1979) (internal citations and footnotes omitted). Finally, "when there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases. This is particularly true where ... the appearance of impropriety is not very clear." *Id.* at 1247.

■ If the representation is not concurrent, but rather involves adverse representation against a former or vicarious client, the court applies the "substantial relationship" test, which requires disqualification when the subject matter of the present representation is substantially similar to the previous representation. *Cinema 5,* 528 F.2d at 1386; *Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746 (2d Cir.1981). The purpose of the "substantial relationship" test is "to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage." *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 571 (2d Cir.1973).[6]

## II. WHO IS THE CLIENT?

■ This case raises an issue of first impression in this Circuit, that is, what is the definition of the government client? In order to determine which test applies to defendants' motion to disqualify C & B, it must first be determined who C & B's client is for conflict of interest purposes. "[A]scertaining who the client really is can be a complex affair when a governmental entity is involved. The definition of 'client' may differ depending on whether the lawyer is representing an individual or an agency, and whose interests are being served by the legal advice." *Gray v. Rhode Island Department of Children,*

*Youth and Families,* 937 F.Supp. 153, 157–58 (D.R.I.1996).

To define the government client, the traditional indicia of an attorney-client relationship must be closely examined. In *Glueck,* the Court of Appeals held that an attorney could not represent the plaintiff in an employment contract dispute against his former employer where a division of the defendant employer was a member of a trade association that was represented by the attorney in negotiating collective bargaining agreements. "[T]he issue is not whether [the firm's] relationship to [the employer] is in all respects that of attorney and client, but whether there exist sufficient aspects of an attorney-client relationship for purposes of triggering inquiry into the potential conflict involved in [the firm's] role as [the employee's] counsel in this action." *Glueck,* 653 F.2d at 748–49 (internal quotation marks and footnote omitted).

In *Glueck,* the Court used the "substantial relationship" test to determine whether the stricter prima facie standard should be applied for disqualification purposes. "[W]e use the ['substantial relationship'] test to determine whether Canon 5 is applicable." *Id.* at 750 n. 6.

> Disqualification will ordinarily be required whenever the subject matter of a suit is sufficiently related to the scope of the matters on which a firm represents an association as to create a realistic risk either that the plaintiff will not be represented with vigor or that unfair advantage will be taken of the defendant.

*Id.* at 750. The Court found that the two representations were substantially similar and involved risks that information gained

6. *See* New York Canon 4 ("A lawyer should preserve the confidences and secrets of a client.").

from one representation could be used to the disadvantage of the client in the other representation. Specifically, the Court found that there was a risk that the issue of whether there was cause to terminate the employee might arise in the collective bargaining discussions the firm conducted for the association, and there was a risk that in preparing for collective bargaining sessions, the law firm might learn of the employer's policies or practices bearing on the subject of the employee's termination. *Id.* Thus, the Court held that the strict standards of *Cinema 5* were applicable in determining whether the attorney should be disqualified from representing the employee. *Id.*

Similarly, in *Chemical Bank v. Affiliated FM Insurance Co.*, No. 87 Civ. 0150(VLB), 1994 WL 141951 (S.D.N.Y.1994), the law firm represented the defendant Affiliated while at the same time the firm represented the interests of a group of "corporate holders," of which Chemical Bank was a member, in a rehabilitation proceeding against the Mutual Benefit Life Insurance Company. The court held that the "substantial relationship" test applied because "there are ... significant differences between [the firm's] representation of [the corporate holders] and the 'traditional' attorney-client relationship to which the per se test applies." *Id.* at *18.

The court noted that 1) the firm did not bill Chemical Bank directly for its share of the group's legal fees; 2) none of the court papers filed in the rehabilitation matter identified Chemical Bank or the other members individually, and the firm appeared in court on behalf of the group; 3) the rehabilitation proceeding was mostly directed by a steering committee of which Chemical Bank was not a member; 4) the direct communications between the firm and Chemical Bank were limited in number and totaled only approximately three

hours; and 5) the bulk of the firm's contacts with Chemical Bank pertained to ministerial matters. *Id.*

Finally, in *British Airways, PLC v. The Port Authority of New York and New Jersey*, 862 F.Supp. 889 (E.D.N.Y.1994), the court held that the relationship between the firm and the Port Authority was a traditional one and was therefore governed by the prima facie rule. There, the firm represented British Airways in a negligence suit against the Port Authority for damage to an aircraft while the firm simultaneously represented the Port Authority in a number of personal injury actions. In reviewing the traditional indicia of an attorney-client relationship, the court found that, unlike in *Glueck* and *Chemical Bank*, the Port Authority is not a member of an association, but rather "the direct client of the firm." *Id.* at 895. "[T]here is no intermediary between the attorney and the client," and, therefore, there is a risk of violating Canon 5. *Id.* at 896. The court also found that the firm "sends draft submissions to the Port Authority for its approval prior to filing them with the court" and that "the Port Authority retains the right to veto or alter any documents submitted on its behalf." *Id.* While the court also noted that the firm did not bill the Port Authority directly, the firm did identify the Port Authority as its client in the personal injury suits, and the firm's contacts with the Port Authority were more than simply ministerial. *Id.*

The court held that "[t]he firm represents both the airlines and the Port Authority directly and therefore both parties are traditional, non-vicarious, non-attenuated and direct clients," *id.* at 897, requiring application of the per se rule. "[T]he dissimilarities between the state personal injury actions and the federal property damage cause of action in this case do not

abrogate the conflict inherent in a lawyer suing his or her own client." *Id.* at 896.

Defendants argue that while the State contracts with C & B through DOB, this is a ministerial function and that the State as a whole is the client because C & B represents the "State's interests." Defendants cite Rule 1.13 of the ABA Model Rules of Professional Conduct and Comment 6 to argue that C & B owes a duty of loyalty to the entire executive branch of the State government. (Def. Mem. At 9). Rule 1.13(a) (Organization as Client) states:

> A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

Comment 6 states:

> [D]efining precisely the identity of the client and prescribing the resulting obligations of such lawyers may be more difficult in the government context. Although in some circumstances the client may be a specific agency, it is generally the government as a whole.

*But see* American Bar Association Formal Ethics Op. 97–405 (Apr. 19, 1997) (a lawyer representing the government "may represent a private client against another government entity in the same jurisdiction in an unrelated matter, as long as the two government entities are not considered the same client, and as long as the requirements of Model Rule 1.7(b) are satisfied.")[7]

The State also relies on *Aerojet Properties, Inc. v. State of New York*, 138 A.D.2d 39, 530 N.Y.S.2d 624 (N.Y.App.Div.1988) to argue that the firm's client is not simply the agency it represents, but the government as a whole. Defendants' reliance on *Aerojet* is misplaced. In *Aerojet*, a law firm represented a claimant against the Bureau of Leases of the State Office of General Services (the "Bureau") in a Court of Claims action for unpaid rent. Three years later, while the Court of Claims action was still pending, the firm was retained by an insurance carrier to represent the State, through the Bureau, in a personal injury suit brought by an instructor in a day care facility operated on state-owned premises. *Id.* at 625.

In its opinion, the Third Department never directly addressed the issue of the definition of the government client for conflict purposes. The court held that a law firm *could* simultaneously represent a client in a suit against a State agency and represent the State in another unrelated action against the same agency. *Aerojet* does not support the State's position here because the *Aerojet* court did not have before it the question of whether the State as a whole is a firm's client where the firm represented one agency in one action and represented a private client against a *different* government agency in the other action. In any event, the *Aerojet* court applied the prima facie standard and did *not* disqualify the law firm. *See* Part II(B) below.[8]

---

**7.** A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents after consultation.

ABA Ann. Mod. Rules Prof. Cond. Rule 1.7 (1999).

**8.** Defendants also cite, among others, *British Airways v. Port Authority*, 862 F.Supp. 889 (E.D.N.Y.1994), and *Guthrie Aircraft, Inc. v. Genesee County, New York*, 597 F.Supp. 1097 (W.D.N.Y.1984), for the proposition that an attorney representing the government may not represent another client against the government. These cases, however, involved the problem of common witnesses and the risk that information gained in the representation of the government could be used to the disad-

C & B argues that its client is DOB, the agency with which it contracts, and OTADA, for purposes of the *Shalala* action. (Pl. Br. at 6–8). C & B relies on *Gray*, in which the court, citing a position taken by the New York State Bar Association, stated that "the appropriate rule should be that a lawyer representing a governmental agency only represents that agency and not the government as a whole." 937 F.Supp. at 158.

C & B also cites a formal opinion issued by the Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York that held that "treating different governmental departments or agencies as separate clients for the application of conflicts rules is in keeping with recent opinions treating separate corporate entities in the private sector as distinct clients for conflicts purposes." Formal Op. No.1999–06. (Remes Aff., Ex. B).

Neither the State's position nor C & B's position adequately reflects the attorney-client relationship between C & B and the State or directly addresses the indicia of the attorney-client relationship to determine, for conflict of interest purposes, whether the State as a whole is C & B's client. As prescribed by the Court of Appeals in, for example, *British Airways* and *Glueck*, I look to the traditional indicia of an attorney-client relationship:

*C & B's Contract with DOB*

The State argues that the fact that C & B's contract is with DOB is simply ministerial and does not indicate that DOB alone is C & B's client. Rather, the State asserts, the contract is evidence of a traditional attorney-client relationship between C & B and the State as a whole. C & B argues that its clients for conflict purposes are DOB and OTADA. Neither of these positions is completely accurate. On one hand, while C & B contracts with DOB and consults with OTADA with respect to the *Shalala* action, DOB and OTADA are not C & B's only State clients. As is apparent from the papers, (*see e.g.*, Attwell Aff. ¶ 8; Robitzek Aff. ¶¶ 10–28), and as conceded at oral argument, (*see* Tr. at 27, lines 1–6),[9] C & B works with various agencies involved in the administration and distribution of Medicaid and public assistance funding, including OMRDD, OMH, DSS and DOH. On the other hand, while C & B represents the "State's interests," those interests are limited to obtaining funding for certain social welfare programs. Under its contract with the State, C & B is only retained with respect to and only entitled to payment for "services rendered for those matters specifically set forth in [the contract], and [it] … shall not be entitled to payment for any other services except as may be entered into by and between the parties hereto." (Attwell Aff., Ex. A at 5). Among the myriad State interests, those implicated by C & B's representation are relatively narrow. Thus, in the governmental context presented here, the agency with which the firm contracts is not determinative of the identity of the client.

vantage of the government in the adverse representation. In *British Airways*, the court found that the Port Authority routinely gave the law firm confidential documents and that the firm had prepared Port Authority witnesses for depositions, whose depositions would possibly be taken in the current action against the Port Authority. *Guthrie* also involved a common witness in the two representations. In one case, the firm defended the deposition of the Superintendent of Highways, while in the other case he was to be adversely deposed by the same firm.

9. References to "Tr. at _, lines _ to _" are to the transcript of the oral argument held on February 16, 2001.

*Consultation with Client*

The Robitzek Affirmation lists the matters that have been the subject of C & B's representation of the State's interests. (Robitzek Aff. ¶¶ 10–28). With a single exception, there is no discussion in the State's papers of the traditional attorney-client consultation, but I presume such traditional consultation between C & B and the agencies listed and/or responsible for the matters set out in the affirmation at ¶¶ 12–28. As to those matters, the relevant agency is surely the client. As to only one matter, *Arizona v. Shalala,* does counsel say anything about traditional attorney-client consultation. There, Mr. Robitzek states:

> My office worked with the Governor's counsel's office in supervising this litigation, including developing strategy, reviewing drafts and making litigation decisions, and retaining [C & B] as outside counsel to represent the interests of the State of New York.

(*Id.* ¶ 11). On the basis of this statement, the State argues that C & B consults with the general counsel staff of various agencies, who in turn consult with the Governor's counsel. As a result, the State asserts, the Governor and the Office of the Governor's Counsel are clients of C & B. (Tr. at 34–35). This position cannot be sustained. The fact that agency counsel seek supervision from the Governor's counsel on issues in which C & B is involved does not make the Governor or his counsel a client of C & B. Consultation between a State agency's counsel and the Governor's counsel is a routine fact of the State government structure. There is no evidence in the record, however, of privileged communications (or indeed any communications) between C & B and the Governor or his counsel relating to the subject of C & B's representation of the State. There is also no evidence in the record to suggest that there is a risk, such as in *Guthrie,* of having common witnesses, that is, representing the Governor or members of his counsel's office under C & B's contract with the State while simultaneously appearing adverse to the Governor or his counsel in C & B's representation of Brown & Williamson.

Additionally, C & B's contract specifically states that C & B "shall advise, assist and represent *appropriate State officials*" in connection with social welfare matters. (Attwell Aff., Ex. A at 3) (emphasis added). A fair reading of the contract is that C & B's retention includes consultation with a limited number of State officials—those responsible for the particular issues specified in the contract. Again, given the diversity of the State's interests, consultation on such a narrow range of issues does not make the State as a whole a client.

Lastly, the State asserts that because DOB is an arm of the executive branch of the State government, the entire executive branch is C & B's client. While DOB is a division of the Executive Department, (*see* Ch. 18, Art. 3, § 31 (McKinney's Executive Law)), it does not follow that the entire Executive Department is a client of C & B. If that were the case, the other divisions within the Executive Department would also be considered clients of C & B, including, for example, the Division of State Police, the Division of Housing, and the Division of Parole. The mere statement of the proposition dictates its rejection. Such a formalistic interpretation would be contrary to the Court of Appeals' direction that "unless an attorney's conduct tends to 'taint the underlying trial,' ... courts should be quite hesitant to disqualify an attorney." *Nyquist,* 590 F.2d at 1246. *Cf., Glueck,* 653 F.2d at 749 (in the context of a vicarious client, the Court of Appeals has held that "[w]e do not believe the strict standards of *Cinema 5* are inevitably

invoked whenever a law firm brings suit against a member of an association that the firm represents. If they were, many lawyers would be needlessly disqualified because the standards of Canon 5 impose upon counsel who seeks to avoid disqualification a burden so heavy that it will rarely be met."). In sum, this factor supports a finding that the agencies responsible for the matters specified in C & B's contract are its clients.

*Billings*

■ The State also argues that C & B bills the State directly and is paid with State funds. While these are traditional indicia of an attorney-client relationship, in the context of a government client, these facts alone are insufficient to support a finding that the State as a whole is C & B's client. First, although it might be desirable for the public fisc, in most circumstances, State vendors are paid at least in part with State funds. Accordingly, the fact that C & B is paid by the State is entitled to little, if any, weight in this context. Second, the fact that C & B bills "the State" does not signify that the State as a whole is the client, especially because under C & B's contract, it interacts with a limited number of agencies on a limited number of specified issues. In fact, a review of C & B's bills reveals that when work was performed for a particular agency, that agency's name appears on the bill. If work was done on a specific public assistance matter that affected several agencies, the bill detailed the work on those

programs, but not necessarily the specific agencies involved. The State has not shown that any of C & B's bills relate to work outside the scope of the contract.[10] While billing is a traditional indication of a attorney-client relationship, in the governmental context, the fact that C & B entitles its bills "State of New York" is not dispositive of the question of whether the State as a whole is C & B's client.

*Substantial Relationship*

■ The State has not alleged that there is a substantial relationship between C & B's representation of the State and of Brown & Williamson in this action. In fact, at oral argument, the State conceded that there was no relationship between the subject matter of the Brown & Williamson action and C & B's representation of the State's interests with respect to public assistance matters. (Tr. at 9, lines 10–18).

In sum, consideration of the above indicia of an attorney-client relationship lead me to conclude that the State as a whole is not a client of C & B and that C & B's representation of the State does not involve the same client as the present action.

A. Application of the Substantial Relationship Test

Because, as conceded by the State at oral argument, the issues in the present action are not substantially related to those in C & B's contractual relationship, I

10. Defendants argue that C & B's July 26, 2000 bill shows that C & B performed work outside the scope of the contract, therefore, they argue, demonstrating that the State as a whole is C & B's client. This bill does no such thing; it merely itemizes legal services provided to the Office of Mental Health, including trademark advice. C & B spent fewer than 20 hours (totaling less than $5,000) researching certain trademarks and communicating the results to OMH. It appears from the itemized entries that OMH was interested in trademarks concerning electronic patient information systems and record keeping. This work does not show that C & B performed generalized legal services for the State or even work outside the scope of its contract. The trademark work was done for a specific public health agency, and the trademarks investigated involved those for systems that would logically be a part of the administration of public health and welfare programs.

deny the State's motion to disqualify C & B.

I am cognizant however, that, as then-Chief Judge Legueux noted in *Gray,* "ascertaining who the client really is can be a complex affair when a governmental entity is involved," 937 F.Supp. at 157, particularly in a case such as this where the firm interacts with various State agencies and officials. Accordingly, I do not end my analysis here but instead, in the alternative, I apply the prima facie rule.

### B. Application of the Prima Facie Rule

■ Even assuming the State as a whole is C & B's client, C & B has met the high burden of demonstrating that its simultaneous representation of Brown & Williamson and the State does not taint the proceedings in this action.

As discussed above, under the unfortunately-named prima facie test, simultaneous adverse representation is prima facie improper. An attorney or firm opposing a disqualification motion must demonstrate that there is no diminution in the vigor of the attorney's representation and no risk that confidential information gained through the prior representation can be used to give an unfair advantage to the present client. *E.g., Nyquist,* 590 F.2d at 1247. Unless the moving party can show that an attorney's conduct will taint the trial, a motion for disqualification should be denied.

As a preliminary matter, it is undisputed that there is no diminution in the vigor of C & B's representation of Brown & Williamson. In fact, Brown & Williamson "is fully satisfied that [C & B] has represented and will continue to represent B & W's interests zealously in this proceeding. B & W has no doubt about the depth or force

of [C & B's] loyalty to B & W or any of the other clients it represents." (Porter Aff. ¶ 2). Not only is this sentiment unchallenged, but, if anything, defendants appear to complain about the vigor of C & B's representation of Brown & Williamson in this action. *See* Bienstock Reply Aff.[11]

Additionally, the State has not claimed that C & B could use confidential information in this action gained from its representation of the State's interests in Medicaid and public assistance matters. "No information has passed between any agency of the State of New York and [C & B] pursuant to any of [the social welfare] matters that is in any way associated with or relevant to the current matter. And no [C & B] lawyers working on the [Brown & Williamson] matter before the Court will be deposing or examining any individuals with whom any [C & B] lawyers work in connection with the [social welfare] matters." (Remes Aff. ¶ 7).

In an effort to demonstrate that C & B's conduct would tend to taint the underlying trial, the State's counsel at oral argument suggested that while C & B attorneys currently consult directly with agency counsel, who then consult with the Governor's counsel, the Governor's counsel's office could theoretically consult directly with C & B, thereby creating a potential risk of the exchange of confidential information or of having a common witness in both representations. (*See* Tr. at 30, lines 3–14; Tr. at 44, lines 1–5; Tr. at 53, lines 21–25 to Tr. at 54, lines 1–20).

The State's argument must fail. As noted above, the State concedes that the two representations are not substantially related. Therefore, information gained from C & B's representation of the State is irrelevant to its representation of Brown & Wil-

---

11. There is also no suggestion by defendants that C & B's representation of the State has

been any less vigorous as a result of C & B's representation of Brown & Williamson.

liamson. In addition, the State does not dispute C & B's statement that no C & B attorneys or State employees working on the State issues are involved or will be involved in the Brown & Williamson matter. Lastly, the State's reliance on a theoretical, heretofore nonexistent, situation raised at oral argument, and not in its papers, is insufficient to demonstrate trial taint. "[U]nless an attorney's [actual] conduct tends to taint the underlying trial . . . courts should be quite hesitant to disqualify an attorney." *Nyquist*, 590 F.2d at 1246 (internal quotation marks and citation omitted).

C & B has demonstrated that there is no risk of a lack of vigor or that confidential information will be used to the disadvantage of the State. Additionally, the State has failed to show that C & B's conduct would tend to taint the trial in the underlying case. Accordingly, even under the more stringent prima facie standard, defendant's motion to disqualify C & B as counsel for Brown & Williamson is denied.

## III. PREJUDICE FROM DISQUALIFICATION

■ I also find that disqualification of C & B would greatly prejudice Brown & Williamson at this late stage of the proceedings, given the expedited discovery schedule and the fact that the preliminary injunction hearing is only two-and-a-half months away. C & B has represented Brown & Williamson for more than 40 years. (Porter Aff. ¶ 3). It would be extremely difficult for Brown & Williamson to find new counsel on short notice who could become sufficiently acquainted with Brown & Williamson's direct sales program, the expert and fact witnesses, and the various legislative and legal issues concerning the sale of cigarettes through non-brick-and-mortar outlets in time to provide effective representation in the preliminary injunction proceeding. (*Id.* ¶ 4). *See Universal City Studios, Inc. v. Reimerdes*, 98 F.Supp.2d 449, 456 (S.D.N.Y.2000) ("Disqualification at this stage would prejudice defendants in that they would be forced either to find and educate new counsel for an important trial that now is less than two months away or seek an adjournment and thus perhaps prolong the duration of the preliminary injunction.").

## IV. WAIVER

C & B also argues that the State has waived its right to seek disqualification by its delay in filing the disqualification motion. C & B asserts that the State knew of its role in the case two-and-a-half months before the State sought disqualification by service of the complaint and through the news articles discussing the case. C & B relies on *Universal City Studios*, in which the court denied a motion to disqualify in part due to a delay of one month in bringing the motion. As here, the court had issued a TRO, and the parties were engaged in expedited discovery when the motion was made. *See also United States v. Newman*, 534 F.Supp. 1113, 1127 (S.D.N.Y.1982) ("Under appropriate circumstances, laches will bar an effort to disqualify the adversary's counsel." Here, there was a delay of two years in bringing the motion.).

The State relies on *Emle Industries* to argue that a motion to disqualify should not be barred on the ground of laches. However, defendants fail to recite that Court's holding in its entirety, that is, that the motion will not be barred *where no prejudice has resulted from the delay*. 478 F.2d at 574. There, the three-year delay in bringing the motion was due to the dormancy of the case.

The State also cites *British Airways* to argue that laches is not a defense to the motion to disqualify. While there was a

two-year delay in bringing the motion, there was no prejudice by the delay. The court, however, stated in dicta that "the application of the laches doctrine might be appropriate in an extraordinary case where it is clear that the disqualification was inspired by dilatory tactics." 862 F.Supp. at 901.

While ordinarily a delay of two months in bringing a disqualification motion would not result in prejudice, as noted above, it has here because of the expedited proceedings. Counsel for both sides have compressed the usual time periods and conducted a motion for a temporary restraining order and expedited discovery and are in the midst of preparing for a preliminary injunction hearing in about two months. Brown & Williamson has invested substantial resources in C & B's accumulation of knowledge and its preparation of the case in the two months before the issue of disqualification was raised and during the briefing period.

This accelerated process, in turn, was the result of the State's request for expedited proceedings after issuance of the TRO. The State was understandably reluctant to consent to extension of the TRO and did so only to permit the minimum time for trial preparation. However, that decision is not without consequences. The State argues in the present motion that C & B's conflict is apparent and disqualification clearly required. Accepting that position as true in this part of the analysis, however, it is equally clear that the State must have made a tactical decision at the outset not to seek what it regards as obviously-required disqualification (or at least raise the issue) and instead chose to pursue expedited proceedings. Having made that choice, it must accept the consequence now and acknowledge the prejudice to Brown & Williamson of permitting C & B to participate in the action virtually until the eve of trial before raising the issue of disqualification.

While I agree that under the appropriate circumstances laches could bar a motion to disqualify, on the record before me, I do not find that the two-month delay in bringing the instant motion to disqualify, by itself, is sufficient to deny the motion. However, consideration of this factor confirms the conclusion reached above.

## V. TACTICAL ADVANTAGE

Finally, I find a hint of tactical maneuvering in the filing of this motion. The State has never moved to disqualify C & B in any other case, including when C & B represented the tobacco manufacturers and the Tobacco Institute against the State Attorney General. Additionally, the State had notice of C & B's representation of Brown & Williamson in October 2000, yet, as noted above, chose to pursue expedited proceedings at the outset and only informed C & B of its intent to file the motion to disqualify in December 2000, after the TRO had been issued and after plaintiffs moved to depose two attorneys in the Governor's counsel's office, a move which, the State informed C & B on more than one occasion, caused "significant displeasure." Finally, the State has failed to show any risk of trial taint, while, at the same time, there would be great prejudice to Brown & Williamson if it was required to seek new counsel at this late stage of the action.

While I do not find that the motion to disqualify was inspired solely by tactical motives, I cannot say that the State is saved from such a conclusion by its arguments that it only recently discovered that there may be a conflict between C & B's representation of Brown & Williamson and of the State. (Tr. at 69, lines 20–25 to Tr. at 70, lines 1–21). *See Chemical Bank,* 1994 WL 141951, at \*19 ("the absence of

any real risk of trial taint or prejudice to Chemical compels me to find that Chemical has pressed this motion solely to obtain a tactical advantage"). Again, while this factor alone is insufficient to bar the motion, its consideration also leads to the conclusion already reached.

## CONCLUSION

As the court stated in *Aerojet:*

Although not determinative, it is significant that there is absolutely no substantive nexus between the two lawsuits. Nor is there any real potential for the disclosure of confidential information, notwithstanding the [government's] involvement in each lawsuit. In essence, [the firm] has not compromised its duty of undivided loyalty to each claimant here or the State in the [other] action. Given the multitudinous nature of the State's activities, even the appearance of impropriety seems de minimis here.... Moreover, to disqualify [the firm] after extensive involvement in this lawsuit ... would prove patently unfair to both the law firm and its client. The circumstances simply do not warrant such drastic relief.

*Aerojet*, 530 N.Y.S.2d at 626.

Accordingly, for the reasons set forth above, defendants' motion to disqualify the law firm of Covington and Burling as counsel for plaintiffs Brown & Williamson and BWTDirect is denied.

SO ORDERED: